258 N.J. Super. 474 (1992)
610 A.2d 415
WILLIAM S. KATCHEN, PLAINTIFF-APPELLANT,
v.
WOLFF & SAMSON, A PROFESSIONAL CORPORATION, JOEL A. WOLFF AND DAVID SAMSON, INDIVIDUALLY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 8, 1992.
Decided July 20, 1992.
*475 Before Judges BILDER, STERN and KEEFE.
Terry E. Thornton argued the cause for the appellant (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys; Zulima V. Farber and Terry E. Thornton, on the brief).
Justin P. Walder argued the cause for the respondents (Walder, Sondak, Berkeley & Brogan, attorneys).
The opinion of the court was delivered by KEEFE, J.A.D.
The issue presented on appeal is whether a 1984 agreement executed by plaintiff, a New Jersey attorney, that provided for the forfeiture of plaintiff's equitable interest in the defendant law firm upon voluntary withdrawal from the firm violates RPC 5.6 and is unenforceable. The Law Division judge, relying substantially on our opinion in Jacob v. Norris, McLaughlin & Marcus, 247 N.J. Super. 266, 588 A.2d 1287 (App.Div. 1991), held that the agreement was enforceable and granted defendants' motion for summary judgment. This appeal followed.
During the pendency of the appeal, the New Jersey Supreme Court reversed our decision in Jacob. Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142 (1992). In doing so, it held that "[f]inancial-disincentive provisions" contained in partnership termination agreements that have "indirect *476 restrictions on the practice of law" are as violative of RPC 5.6 as direct restrictive covenants and are, therefore, unenforceable. Id. at 20-22, 607 A.2d at 148.[1] For the reasons stated herein, we hold that the principles announced by the Supreme Court in Jacob apply to the facts of this case and require a reversal of the judgment under review and a remand for further proceedings.
For the purposes of this opinion we must accept the facts alleged by plaintiff as true and interpret those facts in a light most favorable to him. On January 1, 1983, plaintiff became a member of the defendant law firm, Wolff & Samson, P.A., without a written agreement, issuance of stock, or an understanding of what percentage of stock he would eventually acquire in the firm.[2] Plaintiff testified at depositions that when he joined the firm it was his understanding that Irwin Kimmelman, who was then Attorney General and a former partner in the firm, would be rejoining the firm in the near future at which time it would be "reconstituted" and plaintiff's name would be included in the firm title. It was also plaintiff's understanding that the issuance of stock certificates to members of the firm and the renaming of the firm would occur at that time.
On May 9, 1984, plaintiff and three other non-stockholder partners executed an agreement in which they were designated as "Equitable Stockholders" (The 1984 Agreement). Neither plaintiff nor the other three attorneys contributed to the capital *477 of the firm. In recognition of "numerous valid reasons which [made] it impractical to issue stock of the Corporation to the Equitable Stockholders at [that] time or ... determine the number of shares which the respective Equitable Stockholders [would] be entitled to purchase" the announced purpose of the 1984 Agreement was to "provide the Equitable Stockholders with the same rights regarding death and disability benefits as that provided to other stockholders of the Corporation."
Paragraph one and two of the 1984 Agreement set forth the benefits payable to the legal representative of a deceased equitable stockholder and those payable in the event of sickness or disability. Paragraph four established the value of the equitable stockholders' interest in the corporation as it related to death and disability. Paragraphs five and six of the agreement addressed procedural matters. We quote from that part of the agreement which is pertinent to this appeal:
3. Withdrawal. If an Equitable Stockholder shall voluntarily withdraw from the Corporation, he shall be deemed to have forfeited his equitable interest in the Corporation and the Corporation shall not be required to make any payment whatsoever in regard to such forfeited equitable interest.
* * * * * * * *
7. Entire Agreement, etc. This Agreement contains the entire agreement among the parties and it may be amended only by an instrument in writing signed by all of the then surviving parties hereto, and by the executor or administrator of the estate of each deceased party still having an interest herein. This Agreement shall be binding upon, and inure to the benefit of, the Equitable Stockholders, their respective heirs, administrators and executors, and the Corporation and its successors and assigns.
The 1984 Agreement also stated that the Equitable Stockholders had been made members of the corporation in accordance with the terms of a June 5, 1982 stockholders' agreement (The 1982 Agreement). Plaintiff apparently did not ask for nor was he given a copy of the 1982 Agreement. However, discovery revealed that under that agreement each attorney had paid capital into the firm and received a fractional percentage of shares in return. Importantly, the 1982 Agreement provided that, upon withdrawal from the firm, either voluntary or involuntary, the firm would purchase all the shares owned by the *478 paid-in stockholders at one-half of the "sales price" fixed in that agreement, or $50,000 for the newer partners.
Plaintiff's first significant disagreement with Wolff & Samson occurred in late 1985 when he learned that his name would not be included in the firm name when Kimmelman returned. Upon Kimmelman's return in January 1986, or at sometime shortly before then, proposals for a new shareholder agreement were circulated which plaintiff refused to sign because of its failure to identify plaintiff's share of the firm's capital stock or to provide for withdrawal payments. Plaintiff found the proposed agreement's provision for forfeiture of his interest upon voluntary departure unacceptable, especially as to his share of the work-in-progress.
However, according to plaintiff's deposition, "the kick in the head" occurred at the April 11, 1986 partners' meeting in which it was decided in his absence that
except as follows, no further effort would be made to hire an associate to work for Bill Katchen in the bankruptcy/creditors' rights area and, except for current matters, no associates will be assigned to work on future bankruptcy/creditors' rights matters.
The first exception referred to in the minutes was Kimmelman's attempt to hire an associate then employed with another law firm to do bankruptcy matters. That effort apparently failed. Although plaintiff was unhappy with the decision not to include his name in the firm name, after both Joel Wolff and David Samson indicated they would be favorably disposed to do so, plaintiff testified it was the April 11th meeting that persuaded him to look elsewhere for employment.
Shortly thereafter during a major bankruptcy trial, plaintiff experienced a retinal occlusion caused by high blood pressure that prohibited him from continuing with the case. His request to be replaced by another senior attorney in the firm was refused. Instead, he was replaced by a mid-level associate much to the chagrin of his client. Plaintiff viewed those experiences as evidence of being "cut adrift ... [and] abandoned by the firm."
*479 Plaintiff discussed his reasons for leaving the firm with Samson and Kimmelman. He left the firm on July 1, 1986, approximately ten weeks before the end of the firm's fiscal year. He viewed his departure from the firm as "voluntary" because he "made the selection as to what was appropriate in terms of [his] career." Plaintiff understood that by leaving he was forfeiting his interest in "[t]he right to receive a share of close to a million dollars worth of business that [he] originated and the firm collected when [he] left."

I
In the first count of his pro se complaint, plaintiff contends that the provisions of the voluntary termination clause of the 1984 Agreement violate RPC 5.6. He admitted in his deposition that the termination provisions of the 1984 Agreement did not prohibit him from practicing law with a competing law firm or from representing any of the clients who wished to follow him. However, he maintained that the 1984 Agreement nonetheless violated RPC 5.6 because "[i]f I was not prepared to bring the lawsuit, it would have prevented me from having the right to exercise my own judgment about staying or not staying." He also testified that the provisions in question have a "chilling effect" on a lawyer's decision whether to leave a law firm and represent clients the way they should be represented or stay "in a partnership because of economic reasons" if the lawyer "could not afford the risk" of leaving. He inferred that he was not inhibited in this case from making the move only because he was able to absorb the financial consequences by borrowing money from the new firm and, later, from a financial institution.

II
RPC 5.6 states, in pertinent part, that
A lawyer shall not participate in offering or making:
(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement....
*480 In Jacob, the Supreme Court stated that the "underlying purpose" of the RPC is "to ensure the freedom of clients to select counsel of their choice, despite its wording in terms of the lawyer's right to practice. The RPC is thus designed to serve the public interest in maximum access to lawyers and to preclude commercial arrangements that interfere with that goal." Jacob, supra, 128 N.J. at 18, 607 A.2d at 146. The Supreme Court reasoned that financial disincentive provisions which penalize an attorney who wants to withdraw from a firm must be carefully scrutinized because:
By forcing lawyers to choose between compensation and continued service to their clients, financial-disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer-client relationship and, more importantly, with clients' free choice of counsel. Those provisions thus cause indirectly the same objectionable restraints on the free practice of law as more direct restrictive covenants. As one commentator has stated,
[f]aced with a choice of taking a share of the firm's profits or some of its clients, a partner may well choose the former if it yields a net economic benefit. In that case the client's freedom of choice has been bargained away just as effectively as if the partnership agreement contained a bald restrictive covenant.
Because the client's freedom of choice is the paramount interest to be served by the RPC, a disincentive provision is as detrimental to the public interest as an outright prohibition. Moreover, if we were to prohibit direct restraints on practice but permit indirect restraints, law firms would quickly move to undermine RPC 5.6 through indirect means.
[Id. at 22-23, 607 A.2d at 148-49 (citation omitted).]
Clearly, what the Court found objectionable in the Jacob case was that the withdrawing attorneys were forced to choose between the termination compensation set forth in the agreement or forfeiting that payment in favor of representing clients who wanted to follow them. The Court was fearful that such "financial-disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer-client relationship and, more importantly, with clients' free choice of counsel." Id. at 22, 607 A.2d at 148.
*481 Clearly, the Jacob agreement is different from the 1984 Agreement in this case. The purpose of the agreement in the Jacob case was to penalize departing attorneys if they took the firm's clients while the facial purpose of the 1984 Agreement is to discourage voluntary withdrawal by a partner for any purpose short of disability or death. Competitive withdrawal from the firm is one of several reasons why a partner such as plaintiff could withdraw from the defendant firm. If plaintiff withdrew from the firm because he wanted to bicycle around the world, a hypothetical used by the trial judge as evidence of the 1984 Agreement's equality of treatment, he would not be entitled to set aside the Agreement as violative of RPC 5.6. A withdrawal under such circumstance does not implicate an ethical dilemma concerning client representation. But that is not why plaintiff withdrew from the firm in this case.
The 1984 Agreement violates RPC 5.6 under the facts of this case as alleged by plaintiff because it has the effect of discouraging competition and forces an attorney to decide whether he should stay with a firm that admittedly fairly compensates him or leave the firm at financial risk to himself in order to better serve his clients. Whether plaintiff stays with the firm or leaves it, his clients' choice of counsel is not directly affected since they remain plaintiff's clients. However, the quality of their representation will, in plaintiff's view, differ depending on his choice. Thus, the ethical problem presented in this case is not exactly the same one that confronted the plaintiffs in Jacob.
However, as we see it, the ethical impact is the same, and in one respect it is even more draconian. While the withdrawing attorneys in Jacob were free to practice law and receive appropriate compensation for their interests if they did not take any of the firm's clients, Katchen completely forfeits any interest he may have acquired by becoming an equitable stockholder simply by deciding to practice law elsewhere. Thus, the 1984 Agreement as applied to plaintiff is anti-competitive in the broadest sense. Although the agreement does not specifically restrict plaintiff from practicing law elsewhere upon termination, *482 it has the effect of doing so. As plaintiff points out, "[t]he Forfeiture Provision holds lawyers hostage by requiring them to stay at Wolff & Samson to avoid personal monetary penalties." Such an indirect restriction on an attorney's right to practice law violates the spirit of RPC 5.6 if not its literal prohibition. Where, under the facts of a given case, the financial disincentive has the effect of discouraging "competitive" activities, albeit indirectly, such a provision "violate[s] both the language and the spirit of RPC 5.6. Any provision penalizing an attorney for undertaking certain representation `restricts the right of the lawyer to practice law' within the meaning of the RPC." Id. at 22, 607 A.2d at 148.
The more objectionable aspect of the 1984 Agreement is found in plaintiff's having to make the Hobson's choice of staying with a firm that was not affording him sufficient support to effectively represent his clients, or withdrawing from it and joining a new firm which would give him more support, in which case he would forfeit his equitable interest in Wolff & Samson. Inferentially, plaintiff argues that a less ethical attorney might elect not to incur the financial risk of withdrawing from the firm rather than keep the best interest of his clients paramount. In such circumstances, the forfeiture provision of the Agreement constitutes a restriction on the practice of law in so far as it impacts on client representation and is unenforceable for "if we were to prohibit direct restraints on practice but permit indirect restraints, law firms would quickly move to undermine RPC 5.6 through indirect means." Id. at 23, 607 A.2d at 149.
Thus, we reverse the summary judgment in favor of defendants and remand the matter for further consideration in light of the Supreme Court's decision in Jacob and the principles announced here. On remand plaintiff is free to proceed on his alternate theory of recovery that defendants breached the covenant of good faith and fair dealing implied in all contracts so that a full record is made on this matter. See Noye v. Hoffmann-La Roche, Inc., 238 N.J. Super. 430, 432, 570 A.2d *483 12 (App.Div.), certif. denied, 122 N.J. 146, 584 A.2d 218, and certif. denied, 122 N.J. 147, 584 A.2d 218 (1990). That theory was advanced by plaintiff in his deposition testimony but not fully developed on the record below.
Reversed and remanded.
NOTES
[1] The Supreme Court decision was handed down after the briefs had been filed in this matter. However, the parties were fully aware of the opinion and devoted a substantial portion of the oral argument to its impact on this case.
[2] Wolff & Samson, P.A., is a professional corporation organized pursuant to N.J.S.A. 14A:17-1 to -18. Reference to the term "partner" herein is intended to signify an attorney having a proprietary interest in the firm, whether equitable or paid-in, and is not intended to imply that Wolff & Samson is a "partnership" within the meaning of the New Jersey Uniform Partnership Act, N.J.S.A. 42:1-1 to -43.