279 N.J. Super. 659 (1995)
653 A.2d 1193
LEONARD & BUTLER, P.C., PLAINTIFF-APPELLANT,
v.
EVAN M. HARRIS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 1995.
Decided February 27, 1995.
*662 Before Judges DREIER, VILLANUEVA and BRAITHWAITE.
Gregory R. Leonard argued the cause for appellants (Leonard & Butler, attorneys; John R. Scott, on the brief).
Evan Mason Harris, Esq., argued the cause pro se.
The opinion of the court was delivered by DREIER, P.J.A.D.
Plaintiff, the law firm of Leonard & Butler, P.C., appeals from a declaratory judgment holding, inter alia, that several paragraphs of plaintiff's employment contract with defendant Evan M. Harris, Esq. are void as unreasonable restrictions upon an attorney's continued employment following separation from a law firm.[1] Three paragraphs were the original subject of this appeal, and two are still in dispute.
*663 Defendant was employed by plaintiff as an associate from June 27, 1987 until late 1990 when he was made a seven percent partner or shareholder, and then as a partner through July 19, 1991 when his employment was terminated for economic reasons. In 1988 the firm changed its name from R. Gregory Leonard, Esq., P.A. to Leonard & Butler, P.C. There is a factual dispute whether defendant was informed when hired that he would be required to sign an employment agreement. He contends that he was never so informed; the firm's principals assert to the contrary. According to plaintiff, at the time of defendant's initial employment, one of the partners explained to him that he would be required to sign an employment agreement if he were to work for the firm. Thereafter, defendant interviewed with the principals of the firm who informed defendant that the firm was in the process of having a new form of employment agreement drafted by consultants and that if he accepted employment he would be required to sign an employment agreement.
Even though defendant commenced working for the firm in June 1987, the employment agreement was not drafted until October 1987, and at that time defendant signed the agreement without expressing any reservations. Defendant contends that he signed at the firm's insistence and only did so because he feared losing his job if he did not. There was no new agreement signed in 1990 which reflected defendant's ownership of an interest in the firm because an agreement to that effect had not yet been drawn up. Although defendant's termination on July 19, 1991 was originally intended to take effect after defendant had an opportunity to seek other employment, two weeks later he was asked to leave because of "pernicious" acts that he had allegedly committed against the firm.
*664 As a result of the termination, both parties apparently agreed that they would proceed under the terms of the employment agreement, and defendant was asked to provide a list of clients he wished to take with him. The clients were in turn given the option of remaining with the firm or having defendant represent them. Approximately a dozen clients chose to have defendant represent them.
Defendant expressed to plaintiff that he did not consider various portions of the agreement to be enforceable, resulting in this action to enforce the terms of the agreement and to compel defendant to provide an accounting of all work performed and fees collected on the cases he had taken when he left the firm. Defendant counterclaimed to have the agreement declared void and for an accounting of his interest in the law firm. In a later motion, defendant sought partial summary judgment to have paragraphs 10 through 14 and 16 and 17 of the agreement declared void and unenforceable. Although the motion was initially denied, it was later renewed. In her order of January 24, 1994, Judge Dupuis declared several paragraphs of the agreement unenforceable including paragraphs 11(b), 13 and 14. These paragraphs read as follows:
11. In the event that the client makes a choice to be represented by the Employee who will be leaving the Firm, the Employee agrees that as compensation to the Firm for the loss of the client, the following shall be done:
....
(b) To the extent that fees or costs already incurred are not paid by the client, the Employee personally guarantees that no monies from the client shall be paid to him or her or their new firm prior to full satisfaction of the amount owed to the Firm.
....
13. It is further agreed that as to any matter that is being billed on an hourly rate basis, one half of the fee eventually billed and collected by the Employee after termination of that particular matter, shall be the property of the Firm. This shall be in addition to full payment of all fees and costs incurred through the day that *665 the Employee leaves the Firm. The Employee shall cooperate fully in allowing the Firm to audit all bills on that matter subsequent to termination.[2]
14. It is further agreed that as to matters which are being handled on a contingent fee basis or those estate matters being handled on a percentage basis, the Employee agrees that the entire contingent fee collected or percentage paid on the matter shall be the property of the Firm and that the Employee shall only be entitled to compensation for the reasonable and necessary hours devoted to the matter at an hourly rate which is the same as that which his hourly rate existed while an Employee of the Firm.[3]
Appended to the judge's order was a four-page statement of reasons, in which she stated that the subject paragraphs "act as a financial disincentive and are clearly violative of R.P.C. 5.6." Concerning paragraph eleven (b), she wrote:
Paragraph 11(b) provides that the departing attorney can take no fee until the old firm is paid in full. This seriously restricts the rights of the clients to choose their attorneys.
Concerning paragraph fourteen, she stated:
Paragraph 14 requires that Mr. Harris turnover the entire contingent fee collected on a case to Leonard & Butler even after Mr. Harris leaves the firm.... [T]he provisions in [paragraph] ... 14 have the effect of penalizing Mr. Harris for undertaking continued representation of certain clients and therefore restrict his ability to practice law within the meaning of R.P.C. 5.6. Mr. Harris is being forced to choose between continuing to service his clients and financial-disincentive provisions which may encourage him to give up certain clients, thereby interfering [with] the lawyer-client relationship and with the clients' free choice of counsel. This is in direct contravention of Jacob [v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142 (1992).]
Section 5.6(a) of the Rules of Professional Conduct provides:
A lawyer shall not participate in offering or making: (a) a partnership or employment agreement that restricts the rights of a lawyer to practice after *666 termination of the relationship, except an agreement concerning benefits upon retirement....
Under R. 1:18, judges are required "to enforce the provisions of the Rules of Professional Conduct." As noted by Judge Dupuis:
The Supreme Court in Jacob stated that the `underlying purpose [of the R.P.C. is] to insure the freedom of clients to select counsel of their choice, despite its wording in terms of the lawyer's right to practice. The R.P.C. is thus designed to serve the public interest in maximum access to lawyers and to preclude commercial arrangements that interfere with that goal.' Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 18 [607 A.2d 142] (1992); see also Katchen v. Wolff & Samson, 258 N.J. Super. 474, 480 [610 A.2d 415] (App.Div. 1992). All financial disincentive provisions must be carefully scrutinized because `[b]y forcing lawyers to choose between compensation and continued service to their clients, financial-disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer-client relationship and, more importantly, with clients' free choice of counsel. Id. at 22-23 [610 A.2d 415].'
This is a correct statement of the governing law which must be applied to the disputed provisions of the parties' agreement.
Plaintiff argues that a law firm handling mainly plaintiffs' personal injury cases has not only the usual overhead expenses for rent, library, support personnel and the like, but also must invest heavily in the pending cases in which the firm has provided representation. The firm's inventory of cases requires the firm to advance considerable sums for depositions, experts' fees and similar expenses. Also, as certified civil trial attorneys, the firm must give up a sizeable portion of the fees eventually earned to forwarding counsel, as is permitted by R. 1:39-6(d). Plaintiff further states that it must preserve an interest in the contingent fees against which these disbursements were contracted because a departing partner or associate will most probably request a transfer of only those cases with the greatest probability of recovery. Furthermore, in the months prior to leaving, the departing attorney will exert the greatest efforts and achieve maximum client contact with those clients whose cases will be requested by the attorney. Plaintiff argues that given this scenario, the law firm must be able to protect itself, or else it can be left with cases of lower potential and with a right to only one-half of the expected fees (on average) on the higher-productive files. The firm's *667 expectation on these files was that it would pay the attorney handling the case on an hourly basis but would receive income on the higher contingent fee basis. It thus expected to realize a profit on these files that would help offset possible losses on the less productive files it retained in the office. According to plaintiff, defendant has thwarted these reasonable expectations.
This is a persuasive argument, but it proves too much. The same can be said of any commercial firm, matrimonial firm or even of a defense-oriented trial firm. In the commercial arena, a law firm also invests in the usual overhead on the strength that its retainers will be received and sufficient work will be generated to justify the overhead and expenses advanced on behalf of clients. While the expenses may not be quite as great as in a personal injury litigation practice where contingent fees may be the rule, clients do not always pay on time and considerable accounts receivable are generated. The same is true in a defense trial practice or a matrimonial firm. If in any of these firms a partner or associate leaves with a substantial client or clients, the firm may be left with an insufficient base upon which to cover its contracted-for expenses, at least over the short term. But these are the realities of our profession.
Plaintiff also claims that the agreement does nothing more than follow the dictates of La Mantia v. Durst, 234 N.J. Super. 534, 543, 561 A.2d 275 (App.Div.), certif. denied, 118 N.J. 181, 570 A.2d 950 (1989), in which this court suggested that attorneys should negotiate and specify in their partnership and associate agreements how contingent fees should be allocated and apportioned. Plaintiff contends that it did nothing more than provide a reasonable allocation of these fees. Had it done so, there would be no problem. The issue in this case is not whether plaintiff commendably attempted to resolve uncertainties as suggested in La Mantia, but whether plaintiff resolved these uncertainties in a way that violated the Rules of Professional Conduct. To extend plaintiff's argument, had the agreement provided that all fees eventually collected in any matter assigned to the departing attorney *668 would belong to the law firm, it still would have followed the direction in La Mantia that the allocation and apportionment be specified in an agreement. The patent unfairness of such a provision, however, would also render it unenforceable. The statement in La Mantia that without an agreement a succeeding firm might only be entitled to be compensated on a quantum meruit basis was made before the Jacob and Katchen decisions with their clear focus on the rights of the client rather than merely viewing the respective claims of the law firm and departing attorney.
The Supreme Court has determined in a series of cases culminating in Jacob v. Norris, McLaughlin & Marcus, supra, that the focus of the disruption caused by an attorney leaving a law firm should not be upon the law firm or the departing lawyer, but rather upon the client. If the agreement between the lawyer and law firm impacts upon the client's freedom of choice, that provision must fall. The Supreme Court very practically recognized that while a client might technically have the choice between the law firm or departing attorney, the departing attorney will not seek to accept the client if there is a financial disincentive to do so. We therefore must examine the particular contract provisions to determine whether this disincentive exists.
When we review paragraph 11(b) of the parties' agreement, it is clear that the provision is unenforceable. There is no question that the former law firm has a lien upon the case for the amount of its fees and disbursements, in accordance with the provisions of its original retainer agreement. See N.J.S.A. 2A:13-5. Defendant recognizes this right. However, a departing attorney might determine that the only way he or she could continue to represent the client is to make a new arrangement under which a refundable or nonrefundable retainer is to be received or that the case is to be handled completely or partially on an hourly billing basis. This arrangement, of course, can only affect the portion of the fee payable to the departing attorney, but for some attorneys *669 starting up their own practices, contingent fee arrangements might be too risky.
Paragraph 11(b) effectively precludes such an arrangement. It prohibits any money being paid to the attorney from the client before all sums, including disbursements, due to the law firm are satisfied. Since plaintiff has stressed that there are possibly substantial sums due for discovery or expert fees, the departing attorney would be forced to satisfy all of these payments from his or her pocket before the first retainer dollar could be accepted. This is certainly a disincentive for the departing attorney to request that he or she continue to represent the particular client.
This principle is applicable to other types of law practices. For example, if this same clause were in an agreement in a matrimonial firm where there are often uncollected fees awaiting conclusion of the case, and periodic retainers are paid by the client, a departing attorney would be precluded from accepting any such retainers so long as the much larger eventual fee chargeable for the time already expended remained unpaid. The same would be true in commercial firms where sizeable fees might be paid only at the conclusion of a particular transaction notwithstanding interim billings.
Paragraph 14 of the agreement shows another side of the transaction. Under its terms, plaintiff retains the contingent fee in its entirety, and the departing attorney must work for his or her previous hourly rate until the conclusion of the case. This is the other side of the coin from section 11(b). In a case where the departing attorney wishes to accept the vagaries of the contingent fee arrangement, advancing additional costs and spending uncompensated time, the agreement precludes such action. Where the departing attorney might not wish to accept the case on an hourly fee basis but sees potential in the matter to balance other less profitable cases if an eventual substantial contingent fee is received, the attorney can reap no such benefit and thus has a financial disincentive to accept the matter. Since most of plaintiff's cases are contingent fee matters, this clause would in effect *670 keep defendant as an employee of plaintiff's firm, without fringe benefits, until he builds up an inventory of his own cases, a process that could take years.
Since this was a summary judgment motion, we will apply the standards of Judson v. Peoples Bank & Trust Co., 17 N.J. 67, 75, 110 A.2d 24 (1954) and favor plaintiff with all reasonable inferences from the facts alleged. We will assume that defendant was asked to agree to sign an employment agreement, the terms of which had not yet been drafted. After working for the firm for several months, the agreement was presented to him, and he signed it. But what were his other choices? He could have singled out these basic provisions of the agreement and tried to renegotiate them, or he could have refused to sign. Either of these actions potentially could have caused his dismissal or his being looked upon within the firm with disfavor. As a younger lawyer, he would thus run the risk of having to find new employment and having his resume contain a short term employment which would raise questions concerning his own decision-making ability.
The agreement was also a contract of adhesion. See Vasquez v. Glassboro Serv. Ass'n, Inc., 83 N.J. 86, 101-105, 415 A.2d 1156 (1980). While we do not equate the disadvantages of a lawyer viewing his employer's agreement with the migrant farm worker's problems in Vasquez, the Supreme Court has recognized that for a contract to be enforced as written, there is an assumption "that the parties are in positions of relative equality and that their consent is freely given." Id. at 101, 415 A.2d 1156. "A contract where one party, as here, must accept or reject the contract does not result in the consent of that party ... it is a contract of adhesion...." Id. at 104, 415 A.2d 1156. See also Rudbart v. North Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353-356, 605 A.2d 681 (1992), cert. denied sub. nom., First Fidelity Bank, N.A. v. Rudbart, ___ U.S. ___, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). The contract in this case is therefore subject to the extra scrutiny given to a contract of adhesion. Also, as with *671 any contract, in the event of any ambiguous or doubtful terms, this agreement will be construed against plaintiff as the drafter of the agreement. In re Miller's Estate, 90 N.J. 210, 221, 447 A.2d 549 (1982); Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493, 592 A.2d 647 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991). We do not raise this issue to tread upon the principle that unambiguous contracts will be enforced as written unless they are illegal or otherwise violate public policy. We only mean to foreclose plaintiff from claiming that the contract would not have been interpreted to preclude defendant's acceptance of future contingent fees on cases that had been assigned to him or that he might have been able to accept retainers or other partial fees from a client without having to pay plaintiff for all disbursements charged to the case. Applying the cited rules of construction governing contracts of adhesion and contracts drawn by one party, we see little room to construe the agreement to remove the burdens that cause it to violate the Rules of Professional Conduct.
Judge Dupuis correctly assessed the effect of this agreement. We reject plaintiff's attempts to distinguish attorney's employment contracts for firms primarily representing plaintiffs on contingent fee matters from those applicable to other law firms. The Rules of Professional Conduct as interpreted in Jacob supports the trial judge's decision to declare the particular clauses to be unenforceable. With the additional explanation here given, we affirm the partial summary judgment substantially for the reasons expressed by Judge Dupuis in the addendum to her January 24, 1994 order.
NOTES
[1] Initially, we note this is an interlocutory appeal for which plaintiff never sought leave. Plaintiff's case information statement showed that the determination was not final, and the attached procedural history stated that plaintiff intended to seek leave to appeal, although no such motion was filed. The order appealed from stated that certain matters were denied without prejudice and a date was established for a status conference. Thus the order appealed from lacked the attributes of a final order. If the parties had reached an accommodation concerning the few matters remaining in dispute, this appeal might have proved unnecessary.

At oral argument the parties assured us that they had reached a complete impasse concerning at least one substantial matter, the resolution of which is dependent upon the issues raised in this appeal. With that representation, and with the understanding that our granting of leave to appeal nunc pro tunc in this case shall not be considered precedential, we reluctantly grant plaintiff's belated oral motion for leave to appeal and will treat the matters raised by the parties on their merits.
[2] Paragraph 13 is no longer in dispute. Plaintiff has conceded that the paragraph is unenforceable.
[3] We noted to the parties at oral argument that the literal reading of paragraph fourteen would make the firm responsible to pay the departing employee for the later work he performed on a particular file even though no fee or a minimal fee was earned. Plaintiff explained that this is not what was intended, but that they had noted this apparent problem and had revised the agreement still in use in the law firm.