827 A.2d 1163 (2003)
362 N.J. Super. 350
GROEN, LAVESON, GOLDBERG & RUBENSTONE, a Pennsylvania Partnership, Plaintiff-Respondent,
v.
Mark S. KANCHER and Shaffer, Bonfiglio, Scerni, & D'Elia, L.L.C., Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Submitted June 3, 2003.
Decided July 22, 2003.
Fox, Rothschild, O'Brien & Frankel, attorneys for appellants (Kathryn D. Portner, Atlantic City, and Ronald J. Shaffer, Philadelphia, PA, of counsel; Mr. Shaffer, on the brief).
Archer & Greiner, attorneys for respondent (Charles W. Heuisler, Haddonfield and Arthur H. Jones, Jr., on the brief).
Before Judges STERN, COBURN and COLLESTER.
The opinion of the court was delivered by STERN, P.J.A.D.
Defendants, a former partner of plaintiff law firm and his new firm, appeal from an order of March 5, 2002 entered in favor of plaintiff in the amount of $163,488.24, with interest, for contingent fees in cases taken by plaintiff's former partner, defendant Mark Kancher, Esq., upon his withdrawal from plaintiff firm, and for 50% of any future attorneys fees in such contingency cases. A motion for summary judgment on non-contingent fee cases was denied, without prejudice, pending an accounting. *1164 The matter was certified as final by order of May 31, 2002, and at a Civil Appeal Settlement Program conference, the open claims were dismissed. Hence, we deal only with the dispute relating to the contingent fees.
Defendants, Kancher and his new firm, argue that "the partnership agreement, as construed by the trial court, contains a financial disincentive to withdrawing partners, constitutes an unreasonable restriction on the practice of law and is unenforceable as a matter of law." They also claim that "the trial court's interpretation of the agreement was inconsistent with its plain meaning," and the trial court erred in granting summary judgment against Kancher's new firm and in denying that firm's cross motion for summary judgment.
Under plaintiff's partnership agreement executed by defendant Kancher, the contingent fees in cases he took with him upon withdrawal "shall be divided equally between the Partnership and the withdrawing Partner." The agreement provided in relevant part:
All clients shall be deemed to be clients of the Partnership, and not of the Partner or Partners who brought them to the Partnership or who provide services to them. Upon the withdrawal of a Partner from the Partnership for any reason, all client files shall remain with the Partnership, subject, however, to the wishes of the clients and the requirements of laws and regulations governing the conduct of attorneys-at-law. In the event any client requests that his file be transferred to the withdrawing Partner, then:
A. In the case of non-contingent fee matters, the earned but uncollected fees pertaining to the matter, together with all expenses advanced by the Partnership in respect of the matter, shall be paid to the Partnership either by the client or the withdrawing Partner when the file is delivered to the withdrawing Partner.
B. In the case of contingent fee matters, the fee eventually received for the matter, if any, shall be divided equally between the Partnership and the withdrawing Partner. The expenses advanced in respect of the matter shall be reimbursed dollar-for-dollar at the time the expenses or fee for the matter is received from the client or the adverse party. The first funds received from any source shall be applied to expenses advanced by the Partnership, then to expenses advanced by the withdrawing Partner, and finally on account of fees. In the event no fee or expenses are received, then the withdrawing Partner shall have no responsibility for the expenses advanced by the Partnership before the transfer of the file.[1]
The terms of an agreement concerning fee splitting on termination of a partnership or an attorney's relationship with a law firm could well impact on the decision of the partner or associate to leave a firm, or to do so with cases. Such agreement can affect an attorney's decision, or that of his or her potential new firm, to take cases notwithstanding a client's desire to remain *1165 represented by the attorney who left the previous firm. And if the disengaging attorney has spent considerable work on the case, the client can be disadvantaged if he or she cannot retain the departing lawyer who may be unwilling to devote his resources, or those of the new firm, to such a case when the benefits of his work effort will go elsewhere. Under this view, the partnership agreement both has a "financial disincentive" not to withdraw from a firm, or not to take firm clients, and could impact on the clients' "freedom of choice" with respect to representation. See Rules of Professional Conduct ("RPC") 5.6. See also, e.g., Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142 (1992); Leonard & Butler, P.C. v. Harris, 279 N.J.Super. 659, 653 A.2d 1193 (App. Div.), certif. denied, 141 N.J. 98, 660 A.2d 1196 (1995).
However, we are not dealing with an agreement that has the same impact on the client's right to counsel of choice as in Jacob v. Norris, McLaughlin, supra, or any other case involving a restriction on the withdrawing attorney's ability to continue the representation of a client. Moreover, a partner or associate cannot be permitted to devote firm time and resources on a case with a potentially large contingency and then leave without owing the firm for its services. On balance, we uphold the agreement in dispute and the judgment against Kancher. However, there is at least a question as to the knowledge of the Shaffer firm regarding the scope of the agreement, independent of the ability to enforce it against a non-party, and we reverse the judgment against the Shaffer firm and remand for further proceedings against it.

I.
In mid-July of 1999, Kancher decided to leave plaintiff Groen and join defendant Shaffer, Bonfiglio, Scerni & D'Elia (Shaffer).[2] He brought with him several cases originally with the Groen firm on a contingent fee basis (Groen cases). Kancher entered an agreement with the Shaffer firm (Shaffer Agreement) to give Shaffer 60% of all contingent fees received by Kancher in his cases. When he received fees in the Groen cases, Shaffer retained 60% of the fee, and Kancher sent Groen 50% of his 40% share. Therefore, Groen received 20% of the fees collected in the Groen cases.
Groen filed a complaint against Kancher for violating their Agreement and against Shaffer for the fees to which Groen was entitled.[3] Groen asked the court to require Kancher and Shaffer to provide a full accounting of the fees received and to "compel[ ] said defendants to pay over to plaintiff an amount equal to reimbursement of all costs incurred by plaintiff while it was counsel of record in the matter and 50% of the total fee remaining after deduction of expenses." Similar demands were made with respect to completed and pending non-contingent fee cases.
Following discovery, each party moved for summary judgment. Groen claimed that it was "shorted" $163,488.24 from the fees received in completed cases involving a contingent fee arrangement. The judge concluded that Jacob v. Norris, McLaughlin, supra, "is certainly not factually apposite *1166 here," because "[i]t doesn't involve [a] contingent fee agreement." He found that the term in the agreement was "crystal clear" that any fee received in the Groen cases had "to be divided equally between the Groen partnership and Mark Kancher." He further found that "[i]f Mark Kancher then decided that he's going to split his 50 percent share with his new firm, that's his business, but that should certainly not operate to penalize the Groen firm." The judge found "no violation of any ethical principles," and stated that the issue presented was "not a financial disincentive matter." He decided that Shaffer was liable to Groen for its "ill-gotten gains." Accordingly, the judge awarded plaintiff "the amount of $163,488.24, together with interest on the amount due in each contingent fee case calculated from the date of disbursal" and to "continue to account for and remit to plaintiff fifty per cent (50%) of any future attorneys' fees recovered in the contingency fee matters taken by defendant Kancher upon his withdrawal."
Defendants moved for reconsideration, contending that the court could not hold Shaffer liable to Groen and that the "fee split" was not fair or valid. The judge restated his conclusion that Shaffer was not entitled to the amount of fees that it collected because of the validity of the agreement between Kancher and Groen. As previously noted, the order was certified as final, and the remaining claims were ultimately dismissed.

II.
Defendants claim that the term of the agreement that required Kancher to remit 50% of all contingent fees in Groen cases was unenforceable. First, as to Kancher, they argue that the term should be read to require that Kancher only pay 50% of any amount actually received by him personally and that the trial court erred in reading the term to mean that he must share 50% of the total contingent fee with Groen, before remitting Shaffer its 60% share under the Shaffer Agreement. Defendants also contend that the fee splitting agreement is unenforceable because it violates the ethical rule that bars any agreement which restricts an attorney's ability to practice law. They rely heavily on Jacob v. Norris, McLaughlin, supra, and its progeny for the proposition that the provision impermissibly restricts Kancher's ability to practice law and interferes with the public's access to him as an attorney. They further assert that "requiring the fee division sought to be imposed by the Groen Laveson Partnership Agreement is as direct a restraint on the practice of law by Kancher, and so a deprivation of his services to his clients, as a[sic] outright restrictive covenant," and that "[t]he financial disincentive would have prevented Kancher from representing those clients who chose to follow him from Groen Laveson, as he could not have earned a sustainable living by paying over 50% of the gross fees," to Groen. Defendants claim that, had he known that he would be required to share 50% of all fees earned in Groen cases, Kancher would not have agreed to represent those clients and that refusal would have denied those clients the representation that they desired.
Defendants further assert that the trial court erred in applying summary judgment against Shaffer, because it was not a party to the Agreement or any agreement with Groen. They claim that such application on the basis that Shaffer was aware of the Agreement was an error. Defendants state that Groen did not assert any claim for quantum meruit or any claim of wrongdoing by Shaffer except an assertion that Shaffer was "unjustly enriched." Defendants argue that "Groen Laveson did *1167 not and could not state a claim for unjust enrichment against the Shaffer firm under a contractual or quasi-contractual relationship with the expectation of remuneration," in that "the Shaffer firm was enriched through legal fees earned from clients (third parties)." Therefore, defendants assert that the trial court erred in denying Shaffer its cross-motion for summary judgment.
Plaintiff argues that the judgment against Shaffer was proper because it "was liable for the payment of fees under the Partnership Agreement." It states that "Shaffer Bonfiglio became a party to the dispute when, with knowledge of the express terms of Kancher's Partnership Agreement, the Shaffer firm collected and wrongfully retained contingent fees that it knew belonged to Groen Laveson under that Agreement."[4] Moreover, plaintiff asserts that the cases on which appellants rely for the proposition that the term is invalid for public policy reasons do not warrant a reversal because "there was no `competition' concern in [this] case." It claims that the "Agreement simply directed how fees that were ultimately obtained on the cases Kancher was free to take with him would be reasonably shared with the firm that had invested the time and resources in developing those cases."
It is fundamental that summary judgment should be granted only when no genuine issues of material facts are presented. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Rule 4:46-2(c) mandates that summary judgment be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." The court must consider all papers filed with the court to determine whether there is any genuine material issue. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954). Disputed issues that are "insubstantial" do not overcome a motion for summary judgment. Brill v. Guardian Life Ins. Co. of Am., supra, 142 N.J. at 529-30, 666 A.2d 146.
In reviewing a resolution of a summary judgment motion, "[w]e employ the same standard" as the trial court. Prudential Property & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div.1998). First, we decide "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540, 666 A.2d 146. Then, "[i]f there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a `genuine' issue of material fact for *1168 purposes of" summary judgment. Ibid. Thereafter, we must then determine whether the Law Division's legal conclusions were correct. See, e.g., Prudential Property & Cas. Ins. Co. v. Boylan, supra, 307 N.J.Super. at 168-74, 704 A.2d 597. Summary judgment is warranted where the evidence presented "`is so one-sided that one party must prevail as a matter of law.'" Brill, supra, 142 N.J. at 540, 666 A.2d 146. This is such a case. See Apfel v. Budd Larner Gross Rosenbaum Greenberg & Sade, 324 N.J.Super. 133, 134, 144, 734 A.2d 808 (App.Div.), certif. denied, Apfel v. Novack, 162 N.J. 485, 744 A.2d 1208 (1999); Leonard & Butler, P.C. v. Harris, supra.
The Groen partnership agreement provided that "[i]n the case of contingent fee matters, the fee eventually received for the matter, if any, shall be divided equally between the Partnership and the withdrawing Partner." While we recognize that a dispute concerning the meaning of an agreement may present a factual dispute, at least when it is not so clear as to permit consideration of parol evidence, Trucking Emp. of North Jersey Welfare Fund, Inc. v. Vrablick, 177 N.J.Super. 142, 148, 425 A.2d 1068 (App.Div.1980); Deerhurst Estates v. Meadow Homes, Inc., 64 N.J.Super. 134, 141-42, 152-53, 165 A.2d 543 (App.Div.1960), certif. denied, 34 N.J. 66, 167 A.2d 55 (1961), we agree with the trial judge that no rational fact-finder could reject the plaintiff's interpretation of the agreement. Certainly, plaintiff could not be deprived of fees for work done while Kancher was a partner had he agreed with the Shaffer firm not to take any portion, or only 10% or 20%, of the fee while working there. We also agree with the trial judge that the Groen Partnership Agreement must be read objectively to provide for a 50/50 split of fees collected in the contingent fee cases. Thus, we must evaluate whether the agreement was enforceable as a matter of law and whether the trial judge applied the proper legal standards.

III.
Jacob v. Norris, McLaughlin, supra, 128 N.J. at 14, 607 A.2d 142, on which defendants rely, involved a non-compete clause in a partnership agreement "that barred plaintiffs from collecting termination compensation if they continued to represent firm clients or solicit firm attorneys or other paraprofessionals within a year of their departure." The Court found that clause violated RPC 5.6(a), which prohibits agreements among attorneys that restrict their ability to practice law after termination of a relationship. Id. at 18, 30-36, 607 A.2d 142.
In Leonard & Butler, supra, 279 N.J.Super. at 664-65, 653 A.2d 1193, we dealt with terms in an employment contract between an associate and his firm which provided:
11. In the event that the client makes a choice to be represented by the Employee who will be leaving the Firm, the Employee agrees that as compensation to the Firm for the loss of the client, the following shall be done: ... (b) to the extent that fees or costs already incurred are not paid by the client, the Employee personally guarantees that no monies from the client shall be paid to him or her or their new firm prior to full satisfaction of the amount owed to the Firm.
14. It is further agreed that as to matters which are being handled on a contingent fee basis or those estate matters being handled on a percentage basis, the Employee agrees that the entire contingent fee collected or percentage paid on the matter shall be the property of the *1169 Firm and that the Employee shall only be entitled to compensation for the reasonable and necessary hours devoted to the matter at an hourly rate which is the same as that which his hourly rate existed while an Employee of the Firm.
We concluded that these provisions were "unenforceable," as they conflicted with RPC 5.6(a), in part, because they provided a "financial disincentive" to the "departing attorney." Id. at 668-70, 653 A.2d 1193. As Judge Dreier stated:
The Supreme Court [in Jacob ] very practically recognized that while a client might technically have the choice between the law firm or departing attorney, the departing attorney will not seek to accept the client if there is financial disincentive to do so. We therefore must examine the particular contract provisions to determine whether this disincentive exists.
Since most of plaintiff's cases are contingent fee matters, this clause would in effect keep defendant as an employee of plaintiff's firm, without fringe benefits, until he builds up an inventory of his own cases, a process that could take years.

[Leonard, supra, 279 N.J.Super. at 668, 669-70, 653 A.2d 1193.]
We added that "[i]f the agreement between the lawyer and law firm impacts upon the client's freedom of choice, that provision must fall." Id. at 668, 653 A.2d 1193. Therefore, we held that the provision was unenforceable. Leonard & Butler, supra, 279 N.J.Super. at 669-70, 653 A.2d 1193. See also Apfel v. Budd Larner, supra, 324 N.J.Super. at 135-36, 141-43, 734 A.2d 808 (finding that agreement that departing attorneys would receive a reduced amount in retirement benefits if they left the firm to work in another firm in the State was "anti-competitive" and violated RPC 5.6(a)).
Here, the term was not so restrictive as in Jacob, Leonard or Apfel. Rather, it merely requires that Kancher remit half of the fee eventually collected in contingency cases on which he worked with Groen. Despite his assertion to the contrary, there is no showing in the record that the agreement prevented, as a matter of fact or economic reality, Kancher's ability to continue his practice or to handle cases that clients wanted him to take from plaintiff firm. Even in Leonard, supra, 279 N.J.Super. at 663, 670-71, 653 A.2d 1193, where we found that the employment agreement between an associate and firm (which provided compensation after recovery of a contingent fee only at his hourly rate) was a "contract of adhesion" because defendant did not negotiate the agreement presented to him months after employment began, we recognized "the principle that unambiguous contracts will be enforced as written." Here, the term does not conflict with the "underlying purpose" of the RPC, which the Jacob Court described as designed:
to ensure the freedom of clients to select counsel of their choice, despite its wording in terms of the lawyer's right to practice. The RPC is thus designed to serve the public interest in maximum access to lawyers and to preclude commercial arrangements that interfere with that goal.
[Jacob, supra, 128 N.J. at 18, 607 A.2d 142.]
In LaMantia v. Durst, 234 N.J.Super. 534, 536-37, 561 A.2d 275 (App.Div.), certif. denied, 118 N.J. 181, 570 A.2d 950 (1989), this court dealt with a challenge to the apportionment of a contingency fee as between the firm originally retained for a case and the new firm of a partner who took the case with him when he withdrew *1170 from the firm. We held the second firm liable to the prior firm on equitable principles. Id. at 544, 561 A.2d 275. As Judge Gruccio noted:
Every firm faces the possibility that one of the individual attorneys assigned to a matter could leave with a substantially prepared case. This risk is unavoidable since clients have unfettered discretion to obtain or release counsel. When a lawyer leaves his law firm, a litigation client may understandably elect to "follow" the person who was most heavily involved with that litigation. This fact of professional life, however, should not deprive the firm whose services the client initially sought from equitably realizing fruits of its reasonable expectancy in the contingent fee.

[LaMantia v. Durst, supra, 234 N.J.Super. at 542-43, 561 A.2d 275.]
Thus, we granted a quantum meruit award of one-third of the fee. Id. at 544, 561 A.2d 275. Furthermore, we added that:
The courts should not foster [ ] behavior in the bar by permitting the defecting attorney to obtain a windfall. Such windfalls are created where, as here, the trial court fails to recognize the value of the initial firm's willingness to risk the time and money to develop the claim. By compensating the original firm solely for time spent, the trial court does not permit that firm to benefit from the risk taken and thereby discourages firms from taking such cases. Hence, we cannot ignore the impact of the trial court's valuation of the [plaintiff firm's] efforts on the class of plaintiffs who seek legal assistance in difficult personal injury cases.
Disputes such as this are best averted by properly drafted partnership and associate agreements. These agreements should contain appropriate language fixing the allocation and apportionment of contingent fees.

[LaMantia, supra, 234 N.J.Super. at 543, 561 A.2d 275.]
Having undertaken representation on a contingent fee basis, plaintiff was entitled to part of the fee in the event of recovery, id. at 544, 561 A.2d 275, see also Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437-38, 608 A.2d 280 (1992) (courts have allowed quasi-contractual recovery for services rendered when a party confers a benefit with a reasonable expectation of payment). Here, there is no reason not to enforce the recovery under the terms of the parties' agreement. See, generally, Restatement (Third) of the Law Governing Lawyers, § 9, comment i; § 13.
In Tomar, Seliger, Simonoff, Adourian & O'Brien, P.C. v. Snyder, 601 A.2d 1056, 1057, 1059 (Del.Super.Ct.), appeal refused, 571 A.2d 788 (Del.1990), the Superior Court of Delaware held that an agreement between an attorney, Snyder, and a firm, Tomar, Seliger, Simonoff, Adourian & O'Brien (Tomar, Seliger), "which provided that Tomar, Seliger would transfer certain contingent fee cases to Snyder upon his leaving the firm and that Snyder would pay plaintiff one-third of all fees received by Snyder in connection with the cases," did not violate the Delaware Lawyers' Rules of Professional Conduct concerning fee splitting, and was "valid and enforceable." The court rejected Snyder's contention that the agreement violated the ethical rule that fees must be divided in proportion to services rendered in a case, because it found that rule was designed to prevent "the brokering of legal services," and such brokering was not taking place in the case. Id. at 1058-59. Rather, it noted, citing LaMantia, supra, that "[i]t is not uncommon for a law firm and a departing attorney to divide the fees resulting from contingent fee cases which the attorney *1171 has been handling and will continue to handle after he leaves." Tomar, Seliger, Simonoff, Adourian & O'Brien, P.C. v. Snyder, supra, 601 A.2d at 1059. The court added that clients need not be informed of such agreements between firms and attorneys because clients are "not affected" by such agreements. Ibid.
In Barna, Guzy & Steffen, Ltd. v. Beens, 541 N.W.2d 354, 355 (Minn.Ct.App.1995), review denied, Feb. 27, 1996, the Minnesota Court of Appeals affirmed the grant of partial summary judgment in favor of a law firm with respect to the validity of an agreement requiring a departing shareholder "to pay it 50% of all fees eventually recovered in contingent fees cases [the shareholder, Beens] handled while Beens was at the Barna firm." In enforcing the agreement, which was similar to the one before us, the court, citing New Jersey law, stated:
The clear policy behind subdivision (f) is to encourage law firms to carefully draft agreements in order to prevent disputes when partners or associates leave a firm. See La Mantia v. Durst, 234 N.J.Super. 534, 561 A.2d 275, 279 (App.Div.1989) ("Disputes such as this are best averted by properly drafted partnership and associate agreements."), cited with approval in In Re L-tryptophan Case[s,] 518 N.W.2d 616 620-21 (Minn.App.1994). If such agreements cannot be enforced, law firms will face instability because attorneys will be motivated to leave firms when they receive lucrative contingent fee cases, and attorneys will be encouraged to battle over clients. Furthermore, the enforcement of freely-made contracts is itself in the public interest.
....
Beens contends that the shareholder agreement's provision calling for a 50/50 split of contingent fees serves as a[ ] financial disincentive to a departing partner, thus restricting the former partner's future practice, as well as the client's right to choose a lawyer.
Shareholder agreements that explicitly limit an attorney's right to practice law have been struck down. See, e.g., Dwyer v. Jung, 133 N.J.Super. 343, 336 A.2d 498, 501 (Ch.Div.) (agreement restricting partner from doing business with client of another partner for five years void as against public policy), aff'd, 137 N.J.Super. 135, 348 A.2d 208 (App. Div.1975). Courts have also invalidated termination agreements that implicitly restrict attorneys' practice by imposing financial disincentives to those who compete with their former firms. See, e.g., Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142, 148-49 (1992) (invalidating shareholder agreement prohibiting departure compensation to attorneys who provide services to firm clients within year after departure) Anderson v. Aspelmeier, Fisch, Power, Warner & Engbe [Engberg], 461 N.W.2d 598, 601-02 (Iowa 1990) (holding that law firm violated professional rules of conduct when it terminated payments for former partner's equity interest after he continued to serve firm client), Leonard & Butler v. Harris, 279 N.J.Super. 659, 653 A.2d 1193, 1196, 1199 (App.Div. 1995) (invalidating employment agreement requiring departing partner to turn over entire contingent fee in exchange for previous hourly rate because it interferes with lawyer-client relationship and client's free choice of counsel).
The focus of our decision is the client. As the court stated in Jacob:

The history behind [rule 5.6] and its precursors reveals that the [rule's] underlying purpose is to ensure the freedom of clients to select counsel of *1172 their choice, despite its wording in terms of the lawyer's right to practice.
607 A.2d at 146. The situation here is distinguishable from one in which a separation agreement effectively penalizes an attorney for continuing to represent certain clients.
[Barna, Guzy & Steffen, Ltd. v. Beens, supra, 541 N.W.2d at 356, 357.][5]
See also Baron v. Mullinax, Wells, Mauzy & Baab, Inc., 623 S.W.2d 457, 461-62 (Tex. Ct.App.1981), writ refused n.r.e.
Finally, in Warner v. Carimi Law Firm, 725 So.2d 592, 594, 601 (La.Ct.App.1998), rehearing denied, Jan. 25, 1999, writ denied, 742 So.2d 560 (La.1999), the Louisiana Court of Appeals affirmed partial summary judgment which enforced a fee agreement between an attorney and his former firm. Plaintiff I. David Warner had been a member of the Carimi Law Firm and his contract with the firm provided that Warner would pay 50% of the fees recovered in cases taken from the firm. Id. at 599. On appeal, Warner claimed that this provision "was against public policy, as embodied in the rules of professional conduct." Warner v. Carimi Law Firm, supra, 725 So.2d at 594. The Court of Appeals rejected his claim and restated the prior observation of the trial court that:
if any financial consequence to an attorney is enough to render all agreements with the law firm that he worked with null as against public policy, then that would mean that lawyers could not enter into valid agreements amongst themselves regarding the business aspects of the practice of law ... [A] party asserting public policy as a defense to the contract has the burden of clearly establishing that there is a well accepted and clearly defined public policy that makes the contract terms unenforceable. Warner has not met that burden.

Warner, supra, 725 So.2d at 594.]
The Court of Appeals then adopted the trial court's findings that "Warner has presented no proof that this contract in any way prevented him from representing any client on any file," in part, because:
"any theoretical impairment of a client's ability to choose the attorney of their choice is simply not borne out by the facts of this case. And from a theoretical point of view, this Court notes that an agreement such as the one herein wherein two attorneys in the same law firm who freely agree to a particular split of a fee at the conclusion of a case if one or the other terminates their employment is actually very conducive to the orderly conduct of practicing law ... [T]his Court approves of contracts whereby attorneys avoid unnecessary litigation by setting up formulas between themselves which allow for the orderly break up of a law practice.'

[Id. at 595.]
We agree with these cases, and we affirm the judgment against Kancher.
On the other hand, even though the Shaffer firm acknowledged that it knew about the existence of Kancher's agreement with plaintiff, the record lacks a basis for entering judgment against Shaffer. The trial judge seems to have concluded that mere knowledge of Kancher's obligation was sufficient, at least when it shared a portion of the proceeds received.
*1173 Recently, our Supreme Court held that a constructive trust would be imposed on life insurance benefits received by a widower for the proceeds of a policy that were intended to benefit his wife's children under a pre-existing property settlement agreement with her former husband. Flanigan v. Munson, 175 N.J. 597, 607-11, 818 A.2d 1275 (2003). The Court made clear that no fraud need be shown and that "unjust enrichment" could flow from the decedent's wrongful designation of the beneficiary of funds. Id. at 608, 818 A.2d 1275.
However, the equities and ability to impose a constructive trust depend on the facts. While Shaffer may well have known of the agreement, we do not know when it learned of same or its terms, and we can hardly say it was unjustly rewarded for work done on the cases concluded while Kancher worked there. In fact, the deposition of Shaffer's managing partner was never taken. In any event, the record lacks findings of fact and conclusions of law with respect to the firm because the trial judge focused on the validity of the agreement and Kancher's obligation thereunder.

IV.
The judgment in favor of plaintiff against Kancher is affirmed. The judgment against Shaffer is reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The agreement, which was executed in 1996 and again in 1999, provides "[t]hat the partners have engaged in the practice of law in Pennsylvania" and that the partnership's principal office is in Bensalem, Pennsylvania. The briefs describe defendant Kancher as plaintiff's litigator in New Jersey. Plaintiff has a New Jersey office. In any event, no party raises a choice-of-law issue or suggests that there is a conflict between the governing law of Pennsylvania and New Jersey. The parties debate the case under New Jersey law, and we decide it on that basis.
[2] Shaffer & Scerni became the successor in interest to the Shaffer firm. According to the Lawyers Diary and appendix before us, Ronald J. Shaffer is now situated in Fox Rothschild's Philadelphia office. Shaffer & Scerni have a New Jersey office, and Kancher is located at that office.
[3] The parties provide only a copy of the Amended Complaint.
[4] Plaintiff also asserts an estoppel claim against Kancher, stating:

It is a little disingenuous for Kancher to now claim that he was unaware of the meaning of the contingent fee clause since only four years prior to this action, Kancher handled a matter for Groen Laveson enforcing a similar Partnership Agreement against another departing partner, Murray Issadore. As part of the settlement [ ], Kancher oversaw Issadore's payment of 50% of all fees generated by the contingent fee cases Issadore had taken with him upon his withdrawal.
Given our disposition, we need not examine the estoppel argument based on Kancher's role in the plaintiff firm. See Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420, 447, 672 A.2d 1132 (1996) (no estoppel from challenging forfeiture provision of partnership agreement because "the record does not reflect that Weiss's role in the enforcement process was dominant or significantly different from that of other members").
[5] The court added that "[u]nder the shareholder agreement, Beens will still receive 50% of the contingency fee. As the Barna firm points out, the agreement cannot serve as a financial disincentive because Beens would have received less than 50% of the contingency fee if he had remained at the firm." Barna, Guzy, supra, 541 N.W.2d at 357. We do not know what Kancher would have received if he stayed with plaintiff firm.