734 A.2d 808 (1999)
324 N.J. Super. 133
Kenneth S. APFEL and Dennis M. Reznick, Plaintiffs, and
Robert Novack, Plaintiff-Respondent,
v.
BUDD LARNER GROSS ROSENBAUM GREENBERG & SADE, a Professional Corporation, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued June 7, 1999.
Decided July 27, 1999.
Laurence B. Orloff, Mendham, for defendant-appellant (Orloff, Lowenbach, Stifelman & Siegel, attorneys; Mr. Orloff, of counsel; Mr. Orloff and Craig A. Ollenschleger, Roseland, on the brief).
Robert Novack, plaintiff-respondent, pro se.
Before Judges HAVEY, PAUL G. LEVY and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.S.C. (temporarily assigned).
The law firm of Budd Larner Gross Rosenbaum Greenberg & Sade (Budd Larner) appeals from a summary judgment invalidating a provision in its Shareholders Agreement which denied certain termination benefits to plaintiff Robert Novack, who was leaving defendant with the intention of practicing law with another firm in this State. In granting summary judgment, the Law Division concluded that the provision was anti-competitive and a violation of RPC 5.6. We agree with the court's reasoning and its conclusion that invalidation is required under the decisions in Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420, 672 A.2d 1132 (1996); Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142 (1992); and Katchen v. Wolff & Samson, 258 N.J.Super. 474, 610 A.2d 415 (App.Div.) certif. denied, 130 N.J. 599, 617 A.2d 1222 (1992). Thus, we affirm.
Budd Larner is a law firm based in Short Hills. It also maintains offices in *809 New York and Pennsylvania. Novak joined the firm as an associate in 1979, became a shareholder in 1984, and later became managing shareholder, a position he held until his resignation on September 19, 1997.[1]
In 1988, Budd Larner adopted a Shareholders Agreement (the Agreement) which remained in effect, essentially unchanged, throughout the period involved here. The dispute between Novak and Budd Larner turns on paragraphs five and six of the Agreement. Paragraph five sets out a formula for payment to one who, in the language of the Agreement, "retires, as hereinafter defined." One who does "retire," and who has been a shareholder for at least ten years, receives substantial payments of so-called "deferred income." In Novak's case, those payments amount to approximately $400,000.
Paragraph six contains a formula for termination benefits for one who leaves but does not "retire." Those benefits are substantially less and are paid over a period of time so that, in Novak's case, they would approximate $300,000roughly $100,000 less than he would receive under paragraph five.
Thus, the right to have one's termination benefits computed under paragraph five or paragraph six, turns on whether one "retires." The Agreement defines that term in Section 5(e) as follows:
(e) For the purpose of this Agreement a Shareholder shall be deemed to be retired if the Shareholder ceases the practice of law within all states in which the corporation maintains an office, determined as the date of retirement. Notwithstanding the foregoing, appointment as a member of the judiciary or engagement as a full-time employee attorney by organization or individual other than by a law firm, shall be deemed retirement. If a shareholder returns to the practice of law within two (2) years of the date of his or her retirement, such Shareholder shall return to the Corporation all payments received on account of deferred income and all future payments of deferred income shall cease even if the Shareholder may subsequently retire ...
RPC 5.6 states that,
A lawyer shall not participate in offering or making:
(a) A partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement.
The trial court held that the Agreement violated that provision. The court focused on the definition of "retirement" and found that, in essence, the question of whether a withdrawing shareholder would be deemed "retired," turned almost exclusively on whether he or she was competing with Budd Larner. If the person were continuing to practice law at a firm in any of the three states in which Budd Larner practiced law, the person, no matter how little or how much work he or she performed, would be deemed not retired. On the other hand, if the person were practicing law at a firm in any state other than those three, then, despite how little or how much work he or she performed, or if the person was employed as a judge, corporate counsel or in a non-legal job, he or she would be deemed "retired." The court concluded that the provision was "anti-competitive" because "the definition of retirement is specifically geared to drawing a distinction between competing shareholders and noncompeting retiring shareholders...." While the distinction was purportedly based on whether or not a departing shareholder was retiring, it was in reality *810 based on whether the attorney would be competing with Budd Larner. If the answer was "yes," the individual would receive the lesser compensation package; if the answer was "no," he or she would receive the larger package.
The trial court referred to the three decisions noted above, and we agree that those cases, particularly Jacob v. Norris, McLaughlin & Marcus, supra, are determinative.
In Jacob, the Court's invalidation of an anti-competitive provision in a law firm's shareholder agreement rested on two factors which make clear that the challenged provision here is as invalid as the one set aside in Jacob: first, an indirect "financial-disincentive provision," which discourages attorneys from freely practicing law where and how they choose, violates RPC 5.6 to the same extent as a direct restrictive covenant; and, second, it is the effect of such a provision, and not its formulation, or verbalization, which determines its validity. Jacob, supra, 128 N.J. at 26-27, 607 A.2d 142.
Jacob dealt with a shareholder agreement that drew "a sharp distinction between competitive and non-competitive departures" from the Norris, McLaughlin & Marcus law firm. Id. at 15, 607 A.2d 142. If, within one year of leaving, a departing attorney provides "professional services" to someone who had been a client of the firm when the attorney left, the departure would be deemed "competitive." Ibid. In that event, the attorney's termination benefits would be substantially less than if the departure were "non-competitive"i.e., if the attorney refrained from dealing with any of the firm's clients for at least one year. As the Court put it, the agreement "thus creates a financial disincentive against a departing shareholder's retaining the firm's clients...." Ibid.[2]
In its analysis of the validity of the provision in Jacob, the Court first noted that,
The history behind the RPC and its precursors reveals that the RPC's underlying purpose is to ensure the freedom of clients to select counsel of their choice, despite its wording in terms of the lawyer's right to practice. The RPC is thus designed to serve the public interest in maximum access to lawyers and to preclude commercial arrangements that interfere with that goal.
[Id. at 18, 607 A.2d 142.]
The Court then pointed out that, in Dwyer v. Jung, 133 N.J.Super. 343, 336 A.2d 498 (Ch.Div.) aff'd, 137 N.J.Super. 135, 348 A.2d 208 (App.Div.1975), this state had already held void a restrictive covenant barring an attorney's practicing within a geographic area.[3]Id. at 20, 607 A.2d 142. What it was dealing with now, the Court said, was somewhat different from "direct restrictive covenants": it was dealing with "financial-disincentive provisions." Id. at 22, 607 A.2d 142. Such provisions, the Court noted,
do not impose a blanket or geographical ban on the practice of law nor do they directly prohibit an attorney from representing former clients. By selectively withholding compensation, however, such provisions strongly discourage "competitive" activities.
[Ibid.]
The Court expressed no doubt, however, that its condemnation of the restrictive covenants employed in Dwyer applied equally to the so-called "financial-disincentive provisions":

*811 We believe that indirect restrictions on the practice of law, such as the financial disincentives at issue in this case, likewise violate both the language and the spirit of RPC 5.6. Any provision penalizing an attorney for undertaking certain representation "restricts the right of a lawyer to practice law" within the meaning of the RPC.

By forcing lawyers to chose between compensation and continued service to their clients, financial-disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer-client relationship and, more importantly, with clients' free choice of counsel. Those provisions thus cause indirectly the same objectionable restraints on the free practice of law as more direct restrictive covenants ... Because the client's freedom of choice is the paramount interest to be served by the RPC, a disincentive provision is as detrimental to the public interest as an outright prohibition.
[Ibid.]
The Court also rejected an argument, similar to one urged by Budd Larner here, that it "should distinguish between agreements that require departing lawyers to forfeit their equity interest in a firm and those that merely deprive them of additional compensation unrelated to their vested interest." Id. at 24, 607 A.2d 142. It declined to rest its decision on a semantic difference between whether a particular sum of money is termed an addition to, or a reduction from, the amount otherwise payable to an attorney withdrawing from the firm:
Regardless of whether the compensation in question represents "earned" or "additional" compensation, to condition payment on refraining from practice violates the Rules of Professional Conduct. The operative question is not what income the departing partner has a "right" to receive, it is the effect of the terms of payment on the lawyer's decision to decline or accept those clients who wish to chose him or her as counsel. If the agreement creates a disincentive to accept representation, it violates the RPCs, regardless of the lawyer's "right" to the compensation.
[Id. at 25, 607 A.2d 142.]
On that analysis, and its conclusion that "the provision [in question] operates as a penalty designed to protect the former law firm's turf," id. at 28, 607 A.2d 142, the Court concluded that the section of the Agreement providing for a smaller termination benefit for a competing lawyer was void. To effect a realistic and worthwhile remedy, the court deleted that provision from the agreement and retained those providing for the larger benefits.
Katchen v. Wolff & Samson, supra, is consistent with the holding in Jacob. There, the trial court had granted summary judgment dismissing plaintiff's attack on an agreement plaintiff claimed violated RPC 5.6. Katchen, supra, 258 N.J.Super. at 475, 610 A.2d 415. That decision preceded the Supreme Court decision in Jacob v. Norris, McLaughlin & Marcus, but by the time the matter reached this court on appeal, Jacob had been decided. This court held the agreement invalid under the rule established in Jacob.
Katchen was a so-called "equitable stockholder" in the Wolff & Samson law firm. The shareholder's agreement provided that if an "equitable stockholder" should
voluntarily withdraw from the Corporation, he shall be deemed to have forfeited his equitable interest in the Corporation and the Corporation shall not be required to make any payment whatsoever in regard to such forfeited equitable interest.
[Katchen, supra, 258 N.J.Super. at 477, 610 A.2d 415.]
Katchen decided to leave Wolff & Samson, and he then challenged the agreement which provided for a forfeiture of his interest in the law firm upon his leaving. This *812 court characterized the Jacob holding as a finding that "financial-disincentive provisions contained in partnership termination agreements that have indirect restrictions on the practice of law are as violative of RPC 5.6 as direct restrictive covenants and are, therefore, unenforceable." Id. at 475-76, 610 A.2d 415. We therefore held that "the principles announced ... in Jacob apply to the facts of this case and require" a conclusion that the Wolff & Samson agreement is also void. Id. at 476, 610 A.2d 415.
In reaching that conclusion, this court noted that the effect of the Katchen agreement was even more drastic than that in Jacob. Id. at 481, 610 A.2d 415. Katchen penalized any withdrawal from the Wolff & Samson firm since a departing attorney lost all of his or her "equitable interest" in the firm regardless of whether he or she did or did not compete. Ibid. That difference, however, did not lead to a different conclusion in Katchen from that reached in Jacob. The provision in question was anticompetitive and that was determinative:
The ... Agreement violates RPC 5.6... because it has the effect of discouraging competition and forces an attorney to decide whether he should stay with a firm ... or leave the firm at financial risk to himself in order to better serve his clients.
[Id. at 481, 610 A.2d 415.]
This court then summed up the rule, which was applicable in Jacob, applicable in Katchen and which is applicable here;
Where, under the facts of a given case, the financial disincentive has the effect of discouraging "competitive" activities, albeit indirectly, such a provision "violate[s] both the language and the spirit of RPC 5.6. Any provision penalizing an attorney for undertaking certain representation `restricts the right of the lawyer to practice law' within the meaning of the RPC."

[Id. at 482, 610 A.2d 415 (quoting from Jacob, 128 N.J. at 22, 607 A.2d 142).]
The third case dealing with RPC 5.6 is Weiss v. Carpenter, Bennett & Morrissey, supra, which differs somewhat from Jacob and Katchen since it involves the Court's review of an arbitrator's decision. The arbitrator had found that a provision in the shareholders agreement of the Carpenter, Bennett & Morrissey law firm was anticompetitive and thus violated RPC 5.6. Weiss, supra, 143 N.J. at 423, 672 A.2d 1132. The Court concluded that it would intervene in an arbitrator's decision on such an issue only if it found that the arbitrator's treatment of the issue "would violate a clear mandate of public-policy." Id. at 443, 672 A.2d 1132.
In Weiss, the shareholder's agreement provided that if an attorney left the firm because he or she had reached the age of sixty-five, or to accept a judicial appointment, or because of disability, the attorney would receive a substantial separation package. Id. at 426, 672 A.2d 1132. However, if the departure was for some other reason (including a determination to practice law other than with the Carpenter, Bennett & Morrissey firm, the attorney would receive a much smaller package.) Id. at 426-27, 672 A.2d 1132.
The arbitrator concluded that the restriction "discourages a partner from leaving and becoming competitive with the firm [and therefore] is violative of RPC 5.6." Id. at 444, 672 A.2d 1132. Although the Court concluded, based on the limited standard of review cited above, that it would not address that issue de novo, it seemed almost to go out of its way to endorse the arbitrator's conclusion:
Were we required to address that issue on its merits, we would agree with the arbitrator's conclusion and would hold, consistent with our ruling in Jacob, supra, that Paragraph 10 of the CB & M agreement violates RPC 5.6. The contention that Paragraph 10's impact would affect partners that withdrew from the firm to pursue any occupation, not only the practice of law, does not overcome the inescapable inference that *813 the provision's dominant purpose was to dissuade partners from competing with the firm after withdrawal.
[Id. at 445, 672 A.2d 1132.]
We are satisfied that the trial court was correct in its conclusion that, tested by the holdings of Jacob, Katchen and Weiss, the provision challenged here must be deemed anti-competitive and thus a violation of RPC 5.6. Indeed, that conclusion is clear, compelling and virtually beyond dispute.
The restriction here is, in substance, simply a variation on the theme played out, with the same result, in the line of cases that began with the restrictive covenant in Dwyer v. Jung, supra, and then ran through the more sophisticated restraints in the trilogy of cases just discussed. In each of those casesas herethe effect of the agreement was anti-competitive. In each, the ability of the attorney to practice law, and thus the ability of the public to avail itself of the attorney's services, was either directly restricted or adversely affected by "financial-disincentives." And as all of the cited cases make clear, the latter are as invalid as the former. The "indirect restrictions on the practice of law" violate RPC 5.6 just as much as "direct restrictions, and a disincentive provision" is as detrimental to the public interest as an outright prohibition. Jacob, supra, 128 N.J. at 22, 607 A.2d 142; Katchen, supra, 258 N.J.Super. at 482, 610 A.2d 415.
There is no question that the Agreement here does involve precisely the kind of "financial-disincentive" condemned in Jacob, Katchen and Weiss. The difference between the payments a departing attorney would receive under Paragraph 5, as opposed to Paragraph 6, turns directly on whether that attorney will be competing with Budd Larner. In the case of plaintiff Novak, that difference will amount to $100,000. That is certainly a significant disincentive, and it is precisely the kind of deterrent condemned in Jacob, Katchen and Weiss.
Budd Larner argues that its agreement is valid under RPC 5.6 because it is "an agreement concerning benefits upon retirement." We disagree. As the trial court noted, and as discussed above, the benefits to be paid or withheld under this agreement do not turn on any bonafide retirement. The size of the benefits depend not on age or years of service (beyond a minimum of ten years with the firm) but rather turn on competition or non-competition with Budd Larner. Thus, a withdrawing attorney could move to any state other than New Jersey, New York or Pennsylvania, join or form a firm and make a good deal of money, and he or she would be entitled to the larger, non-competitive benefits payable under the Agreement. On the other hand, if that attorney decided to open a one-person law firm and practice in any one of the three proscribed states, he or she would only receive the smaller package of benefits. And the sole difference would be whether or not the person practiced in the same state asand thus was able to compete withBudd Larner. Under no realistic analysis could this Agreement be deemed one providing retirement benefits. It is clearly a restrictive covenant, with substantial financial disincentives, cloaked as a retirement agreement.
Budd Larner also argues that its agreement should be enforced under the "equitable principles" referred to by the Supreme Court in Jacob. Those principles, however, as subsequently limited and explained in Weiss, clearly have no application here.
In Jacob, the Court referred to the possibility that "equitable principles might bar a plaintiff's recovery if the plaintiff had been a senior partner instrumental in drafting a restrictive agreement, imposing it on his or her fellow partners or employees, and then sought to have the provision declared unenforceable when he or she decided to leave." Jacob, supra, 128 N.J. at 36, 607 A.2d 142. However, in Weiss, the Court qualified and severely limited that proposition. As the Court put it, *814 [O]ur observation in Jacob about equitable estoppel should be understood to refer to a unique and extraordinary exercise of control by a dominant partner in a law firm, one who initiated and demanded the inclusion of the forfeiture provision in the firm's agreement and subsequently exerted a dominating influence in insisting that the forfeiture provision be enforced against withdrawing partners.
That narrowing construction of our language in Jacob demonstrates that its objective was to avoid the apparent unfairness of allowing an exceptionally influential dominant partner in a law firm to challenge the validity of a forfeiture provision that he or she initiated and implemented virtually single-handedly. The estoppel doctrine should not apply to the ordinary senior partner who merely participated in the partnership decisions to adopt and enforce the provision.
[Weiss, supra, 143 N.J. at 447, 672 A.2d 1132.]
Nothing in this case indicates that Novak had the kind of role described in Weiss: that he "virtually single-handedly" initiated and implemented the shareholders agreement; that his actions represented a "unique and extraordinary exercise of control"; that he was the "dominant partner" who "initiated and demanded the inclusion of the forfeiture provision" in the agreement or that he "subsequently exerted a dominating influence in insisting that the forfeiture provision be enforced against withdrawing partners." For all that appears, while Novak was a senior partner, he had none of those extraordinary contacts with, or influences over, the Agreement or the illegal restrictive clause he now challenges. In Weiss, the Court rejected the application of those so-called "equitable estoppel" principles, noting that, although Weiss served on the firm's Executive Committee, there was no evidence that he played a unique role in perpetuating or enforcing the forfeiture provision. Ibid. The same is true of Novak and there is no more basis for applying those principles here than there was in Weiss.
Finally, we reject defendant's argument that this case was not ripe for summary judgment, and the matter should be remanded for trial. We see no bonafide issues of fact, nor does defendant point to any. Its claim seems to be that evidence should be taken as to the subjective intent of the various individuals involved in preparing the Agreement. Such evidence, however, would not change the conclusion reached by the trial court and affirmed here. It is the effect of the Agreement that is determinative, regardless of whatever subjective motivation might be ascribed to one or another of the participants. And the effect of the Agreement here is clear: it is anti-competitive and void and summary judgment so declaring was entirely proper. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954).
Affirmed.
NOTES
[1] Plaintiffs Dennis M. Reznick and Kenneth S. Apfel did not take part in this appeal. Reznick chose not to appeal a summary judgment entered in favor of Budd Larner, and Apfel settled his dispute with Budd Larner.

After Novak left Budd Larner, he became a partner in another law firm located in the same building as Budd Larner.
[2] The agreement also deemed a departure "competitive" if the attorney who left solicited another attorney, or a paralegal, from Norris, McLaughlin & Marcus to "engage in the practice of law with the departed member...."
[3] While Dwyer v. Jung was a trial court decision affirmed by the court, the Supreme Court noted in Jacob that it had expressly endorsed the Dwyer holding in Karlin v. Weinberg, 77 N.J. 408, 419, 390 A.2d 1161 (1978). In also noted that other states had "almost uniformly" invalidated restrictive covenants just as Dwyer had done. Id. at 20-21, 607 A.2d 142.