827 A.2d 1121 (2003)
362 N.J. Super. 284
Robert D. BORTECK, Esq., Plaintiff-Respondent,
v.
RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 2003.
Decided July 21, 2003.
*1122 Glenn A. Clark, Morristown, argued the cause for appellant (Riker, Danzig, Scherer, Hyland & Perretti LLP, pro se; Mr. Clark and Charles F. Waskevich, Jr., of counsel; Mr. Clark, on the brief).
Robert Novack, Short Hills, argued the cause for respondent (Edwards & Angell, attorneys; Mr. Novack and Mary L. Moore, on the brief).
Before Judges SKILLMAN, CUFF and LEFELT.
The opinion of the court was delivered by CUFF, J.A.D.
In this appeal, we review an order granting plaintiff's motion for summary judgment and granting specific performance of the early retirement provisions of a law firm partnership agreement. We affirm.
Plaintiff Robert Borteck is a lawyer and a former capital partner at defendant Riker, Danzig, Scherer, Hyland, & Perretti LLP (Riker). After eleven and one-half years at Riker and at fifty-three years of age, he withdrew from the partnership and joined Edwards & Angell, LLP (E & A) as a partner in its New Jersey office. In accordance with Riker's partnership agreement, Borteck received his share of the capital account. When the firm refused to pay him early retirement benefits, he filed an action seeking specific performance of the partnership agreement; Riker filed a counterclaim in which it asserted claims for breach of fiduciary duty, breach of the duties of loyalty and confidentiality, and tortious interference with prospective economic advantage. It also asserted a claim for breach of the partnership agreement due to Borteck's failure to provide ninety days notice of his intention to resign from the firm.
Borteck filed a motion for summary judgment on the specific performance claim; Riker filed a cross-motion. Borteck also filed a motion to quash various subpoenas served by Riker on E & A and three individuals. Judge Cramp granted Borteck's motion for summary judgment. He ruled that in light of Rules of Professional Conduct (RPC) 5.6 and interpretative caselaw, the early retirement plan established by Riker, including the ninety-day notice provision, was anti-competitive in effect and unenforceable. He said:
I think that the New Jersey cases, including our Supreme Court, have made it very clear that if there is an anticompetitive effect of any kind of a plan or any rule in a law firm that the rule or plan cannot stand. And I think that's what is happening here.
This does have anticompetitive effects. Nobody can dispute that.... There may be many good reasons for the plan. There may be nice dovetailing into 401Ks and that type of thing, but the fact of the matter is that this is not a retirement plan with an age requirement that applies to everyone. It's an age requirement that applies essentially only to those who may leave for reasons other than public service. And it seems to me clear that most people who leave law firms ... go with other law firms. And that seems to me to be the effect of this agreement, despite the fact there may *1123 have been very good intentions with respect to the agreement. But it has that effect. And I understand that RPC 5.6 indicates an exception and that's an agreement concerning benefits upon retirement. I'm not convinced that that provision would deal with a retirement plan that has anticompetitive effects.
* * *
I find the same with respect to the 90-day requirement. That's anticompetitive in and of itself. There may be many good reasons why you should have a 90-day requirement, but you can't look at that kind of requirement as anything other than anticompetitive, and that's the effect of it.
The motion judge also limited the scope of the subpoenas issued by Riker. In separate orders, this court ruled that the February 22, 2002 summary judgment order is a final judgment and denied Riker's motion for leave to appeal from the orders concerning the subpoenas issued by it.
Riker has been governed by the partnership agreement at issue in the present appeal since 1989. The partnership agreement includes two provisions, Paragraph 14 and Paragraph 17, at issue in this appeal.[1]
Paragraph 17 sets out Riker's retirement plan. Paragraph 17(A) provides that a capital partner of the firm is entitled to a share of the firm's "net worth" and that, upon withdrawal from the firm, the capital partner will be paid the value of that share over the first twelve months of such withdrawal. Borteck has received this benefit.
Paragraph 17(C) sets out the "Early Retirement Benefit Payments" due a withdrawing capital partner. The portion at issue provides that:
In addition to payment for Net Worth, as set forth in Paragraph 17(A) of this Agreement, a retiring Capital Partner who has been a partner of the [Riker] Firm, or predecessor firms, for a period of at least ten (10) consecutive years, and who, throughout the subsequent five year Early Retirement Benefit Payment period following such Retirement from the Firm, continuously remains in retirement status hereunder, shall receive Early Retirement Benefit Payments equal to a percentage ("Applicable Early Retirement Percentage") of such partner's average annual earnings from the Firm or predecessor firms for his or her last five full calendar years immediately preceding retirement as a Capital Partner of the Firm....
Paragraph 17(C) also sets out a "schedule" to determine the applicable early retirement percentage to be applied to particular classes of retiring capital partners. Under the schedule, the applicable early retirement percentage for retiring partners with Borteck's years of service as a partner with Riker, ten or more but less than fifteen years, is seventy-five percent of their average annual earnings in the five calendar years preceding retirement.
Additionally, Paragraph 17(C) specifies that early retirement benefit payments "shall be paid in 96 equal semi-monthly installments, the first installment being due thirteen months after retirement from the Firm." Thus, payments under Riker's early retirement plan, as set out in Paragraph 17(C), commence in the month following completion of the one-year net worth payout made to withdrawing partners under Paragraph 17(A) and continue for four years thereafter. A withdrawing capital partner eligible under Riker's early retirement plan would therefore receive payments from Riker over a five-year period: *1124 one year of net worth payments, followed by four years of early retirement benefits.
Finally, Paragraph 17(B), which addresses the "Retirement of a Capital Partner," contains the eligibility criteria for retirement benefits. The agreement requires permanent retirement or withdrawal from the private practice of law with certain exceptions. It provides:
For purposes of Paragraph 17 of this Agreement, the term "retirement" shall mean permanent retirement of a Capital Partner of the Firm from the private practice of law, whether or not due to disability, subject to the following qualifications:
(1) Except in the case of the situations identified in Paragraph 17(B)(3) below, or in the case of a Capital Partner who becomes disabled, the Capital Partner is at least fifty-five (55) years of age.
(2) Continuation with the Firm in an Of Counsel capacity after retirement as a Capital Partner of the Firm shall not be deemed to be inconsistent with eligibility for retirement benefits hereunder.
(3) It has been common for partners of the Firm to join the Firm after completion of a period of public service, to leave the Firm permanently or temporarily to pursue public service, or to devote substantial time to public service activities while remaining a partner with the Firm. The Firm recognizes a professional obligation to serve the public and wishes to continue to encourage such participation by partners of the Firm. Therefore, a partner shall be deemed to have retired from the private practice of law notwithstanding that he or she leaves the Firm to accept an appointment to the bench, to assume an elected or appointed governmental position, to assume a position in academia, to become a public advocate, to become a public defender, to become a legal services attorney, or to engage in comparable public service work at a compensation level comparable to that normally associated with the foregoing enumerated activities.
* * *
Any retired Capital Partner's entitlement to continuation of any retirement benefits provided for in this Agreement during his or her lifetime shall be conditioned at all times upon his or her continuously remaining in a retirement status, as defined in this Paragraph 17(B), throughout the entire applicable retirement benefit payment period, including continuous compliance with the foregoing criteria. In the event that such retirement status shall cease during his or her lifetime, then entitlement shall permanently terminate with respect to all unpaid retirement benefit payments.
The remaining provision of Riker's partnership agreement involved in this appeal is Paragraph 14, which addresses the "Voluntary Withdrawal of [a] Partner" and establishes a ninety-day notice requirement. It provides:
Should any partner desire to retire or withdraw from the Firm, he or she shall give not less than three months' prior written notice of such intention to retire or withdraw to the other partners, provided, however, the Management Committee, in its judgment, may make the retirement or withdrawal effective at such earlier date as it may determine if circumstances so warrant.
Plaintiff was born on May 14, 1947, and was fifty-three years of age on September 29, 2000. He joined Riker as a capital partner on April 1, 1989. He was admitted *1125 to practice law in 1972 and specializes in trusts and estates. By September 29, 2000, plaintiff had been employed for more than ten years, but less than fifteen years, as a capital partner with Riker.
On September 29, 2000, plaintiff voluntarily withdrew from his position as a partner with Riker. He did so suddenly and without prior notice to Riker of his intention to do so. Immediately upon leaving Riker, plaintiff joined E & A and began soliciting many of his former clients at Riker. He also successfully recruited two Riker lawyers to join him at E & A.
It is undisputed that, over the course of twelve months from October 1, 2000 to September 30, 2001, Riker paid plaintiff in quarterly installments the total amount ($145,649.48) due him under Paragraph 17(A) from Riker's net worth. On October 23, 2001, plaintiff sent a letter to Riker expressing his understanding that, "[i]n accordance with the provisions of the [Riker] firm's partnership agreement," he was "entitled to begin receiving my [early] `retirement' benefit [under Paragraph 17(C)] thirteen months after withdrawing from the firm, i.e. on November 1, 2001," and that "[a]ccording to the applicable formula, each of the 96 equal semi-monthly installments should be in the amount of $2,865.52."[2]
In an October 31, 2001 letter, Riker denied that it owed plaintiff any other monies. It cited his continued involvement in the private practice of law.
Accordingly, you are not "retired" within the meaning of the partnership agreement or any common definition of the term. Given that we have now paid you your [net worth] capital [pursuant to Paragraph 17(A)], we are not aware of any other payments due you from the firm.
The RPCs govern the practice of law in this State. RPC 5.6 governs restrictions on the right to practice. As it pertains to this appeal, it provides:
A lawyer shall not participate in offering or making:
(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement....
The Court has declared that the purpose of RPC 5.6 is to ensure the freedom of clients to select counsel of their choice and is designed to preclude commercial arrangements that interfere with that purpose. Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 18, 607 A.2d 142 (1992).
In Jacob, the Court emphasized that the RPCs govern the practice of law based on ethical principles rather than commercial standards of reasonableness. Id. at 27, 607 A.2d 142. Therefore, the Court invalidated a provision in a partnership agreement which withheld termination compensation only from those withdrawing partners who represented clients of the firm within one year of withdrawal or solicited firm employees to engage in practice with the withdrawing partner. Id. at 22, 607 A.2d 142. The Court reasoned that the agreement barred a client from retaining its attorney of choice. Ibid.
In Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420, 672 A.2d 1132 (1996), the Court held that provisions in a law firm's partnership agreement were unenforceable which withheld the right to receive *1126 distribution of a partnership capital account only from partners who withdrew from the firm for any reason other than as specified in the agreement. Id. at 444-45, 672 A.2d 1132. It did so in the context of reviewing a decision of an arbitrator to whom the withdrawing partner and the firm had submitted the controversy. Ibid. Rejecting the firm's argument that the agreement cannot be considered violative of RPC 5.6 because it governs any partner who withdraws from the firm for any reason other than as specified in the agreement and engages in any occupation, the Court said:
The contention [that the contested provision's] impact would affect partners that withdrew from the firm to pursue any occupation, not only the practice of law, does not overcome the inescapable inference that the provision's dominant purpose was to dissuade partners from competing with the firm after withdrawal.

[Id. at 445, 672 A.2d 1132.]
In Heher v. Smith, Stratton, Wise, Heher & Brennan, 170 N.J. 213, 785 A.2d 907 (2001), the withdrawing partner contested a provision in the partnership agreement which allowed a withdrawing partner to collect a "stated benefit" and a "supplemental benefit," if the partner did not compete in any way with the firm following withdrawal. Id. at 216, 785 A.2d 907. The Court held that the law firm was estopped from contesting the timeliness of plaintiff's arbitration request. Id. at 221, 785 A.2d 907. The Court reasoned that to do so would allow the firm the benefits of a covenant that was clearly contrary to public policy and unenforceable. Ibid.; see also Katchen v. Wolff & Samson, 258 N.J.Super. 474, 482, 610 A.2d 415 (App. Div.) (invalidating partnership agreement which prescribed forfeiture of value of equitable shareholder's interest contrary to RPC 5.6 because it discouraged competition and forced attorney to choose between his economic well-being and the best interests of his clients), certif. denied, 130 N.J. 599, 617 A.2d 1222 (1992).
In Leonard & Butler, P.C. v. Harris, 279 N.J.Super. 659, 653 A.2d 1193 (App. Div.), certif. denied, 141 N.J. 98, 660 A.2d 1196 (1995), this court held that provisions in an employment agreement barring a former employee from accepting a fee from a client of the former employer until any indebtedness to the former firm was paid was contrary to RPC 5.6. Id. at 668, 653 A.2d 1193. We recognized that agreements pertaining to the allocation of fees and the ability to collect a fee for new work performed for a client of the former firm inhibits the client from selecting its attorney of choice. Ibid.
Each of these cases involve provisions which may be invoked on the occasion of the withdrawal of a partner, although none of the agreements was specifically considered a retirement agreement. In Apfel v. Budd Larner Gross Rosenbaum Greenberg & Sade, 324 N.J.Super. 133, 734 A.2d 808 (App.Div.), certif. denied, 162 N.J. 485, 744 A.2d 1208 (1999), this court considered a shareholder agreement which specifically addressed benefits due to a withdrawing partner in the event of retirement. The Budd Larner agreement defined retirement as cessation of the practice of law in all states in which the firm maintains an office or appointment as a member of the state or federal judiciary or employment as an employee by an organization or individual other than a law firm. Id. at 135, 734 A.2d 808. If a withdrawing partner continued the practice of law in any state in which the firm maintains an office, the attorney received a lesser monetary benefit. Ibid.
*1127 In the course of invalidating the Budd Larner retirement scheme as violative of RPC 5.6, we said:
The restriction here is, in substance, simply a variation on the theme played out, with the same result, in the line of cases that began with the restrictive covenant in Dwyer v. Jung, supra, [133 N.J.Super. 343, 336 A.2d 498 (Ch.Div.), aff'd, 137 N.J.Super. 135, 348 A.2d 208 (App.Div.1975)] and then ran through the more sophisticated restraints in the trilogy of cases just discussed.[3] In each of those casesas herethe effect of the agreement was anti-competitive. In each, the ability of the attorney to practice law, and thus the ability of the public to avail itself of the attorney's services, was either directly restricted or adversely affected by "financial-disincentives." And as all of the cited cases make clear, the latter are as invalid as the former. The "indirect restrictions on the practice of law" violate RPC 5.6 just as much as "direct restrictions, and a disincentive provision" is as detrimental to the public interest as an outright prohibition.

[Id. at 141-42, 734 A.2d 808 (citations omitted).]
In reaching this conclusion, we emphasized that the difference between entitlements on withdrawal did not turn on age or years of service but on whether the attorney competed or did not compete with the firm. Id. at 142, 734 A.2d 808.
Riker contends that its retirement agreement avoids the shortcomings of the Budd Larner agreement because the amount of benefit turns on age and years of service. It cites the requirement that a partner must be fifty-five years of age to qualify for the early retirement benefit. Furthermore, the ninety-day notice provision aids Riker to assure continuity of service to its clients.
Compliance with RPC 5.6 turns on the effect of a provision not its formulation or verbalization. Jacob, supra, 128 N.J. at 26-27, 607 A.2d 142; Apfel, supra, 324 N.J.Super. at 137, 734 A.2d 808; see also Weiss, supra, 143 N.J. at 444-45, 672 A.2d 1132 (the impact and perceived dominant purpose of the disputed disincentive provision determines whether the provision contravenes RPC 5.6).
Here, the Riker agreement defines retirement in terms which assure that the withdrawing partner will not compete with the firm. In Paragraph 17(B), Riker deems a capital partner retired if the partner is disabled, serves in an Of Counsel capacity with Riker, or participates in public service, which includes appointment to the judiciary or service as an attorney employed by the state or federal government. A capital partner will qualify for early retirement benefits if the attorney meets the definition of retirement and is fifty-five years of age. The age requirement and the notice requirement, however, may be waived in the case of a capital partner who withdraws to engage in public service or to accept an appointment to the state or federal judiciary.
To be sure, the concept of retirement has evolved over the years. Many people no longer consider retirement as the cessation of all work. Many consider retirement as an opportunity to pursue interests and professional activities that had been subordinated due to the demands of the private practice of law. Nevertheless, measured against existing precedent, the *1128 Riker early retirement benefit and the ninety-day notice provisions fail because the provisions have anti-competitive effects prohibited by RPC 5.6. Read together, the challenged provisions effectively deny retirement status to withdrawing attorneys who continue to pursue the private practice of law. The capital partner who is less than fifty-five years of age and accepts a position on the state or federal bench continues to work in the legal profession. The capital partner who is less than fifty-five and takes a position as Attorney General or United State Attorney or the Public Defender continues the practice of law. In addition, the positions occupied by these former partners generally reflect favorably on the firm with which the attorney practiced before the appointment. The only difference between Borteck and the withdrawing partner who becomes a judge or the Attorney General is that the latter will not compete with Riker. It is that anti-competitive effect which contravenes RPC 5.6.
We do not suggest that a retirement plan may not condition receipt of benefits on curtailment of the private practice of law. Indeed, RPC 5.6 expressly excepts from its prohibition "an agreement concerning benefits upon retirement." Moreover, several jurisdictions have held that a restriction on the private practice of law on an attorney as a condition for receipt of retirement benefits is not contrary to the public policy embodied in RPC 5.6. See, e.g., Schoonmaker v. Cummings & Lockwood, 252 Conn. 416, 747 A.2d 1017, 1030-31 (2000); Hoff v. Mayer, Brown & Platt, 331 Ill.App.3d 732, 265 Ill.Dec. 225, 772 N.E.2d 263, 265-66, appeal denied, 201 Ill.2d 567, 271 Ill.Dec. 925, 786 N.E.2d 183 (2002); Donnelly v. Brown, Winick, Graves, Gross, Baskerville, Schoenebaum & Walker, P.L.C., 599 N.W.2d 677, 678-79 (Iowa 1999); Miller v. Foulston, Siefkin, Powers & Eberhardt, 246 Kan. 450, 790 P.2d 404, 411 (1990). In each instance, however, even the agreements which defined retirement broadly to include something less than the complete cessation of employment, the agreement contained definitive age and longevity requirements. These requirements have been described as characteristics of a bona fide retirement plan. Donnelly, supra, 599 N.W.2d at 682. Continuation of retirement benefits until the death of the retiring partner and then to his surviving spouse may also serve as a characteristic of a bona fide retirement plan. Cohen v. Lord, Day & Lord, 75 N.Y.2d 95, 551 N.Y.S.2d 157, 159, 550 N.E.2d 410 (1989).
Although Riker's plan purports to have definitive age, longevity and notice requirements, the notice provision is subject to waiver and the age provision inappropriate when a partner enters public service, a form of practice which is not competitive with Riker. We recognize the laudable expressed intent of the Riker agreement to encourage participation in public service by Riker's partners. Once the age requirement and, to a lesser extent, the notice requirement are subject to waiver, however, the purported retirement plan resembles a termination plan rather than a retirement plan. As a termination plan for a withdrawing capital partner, the effect of the plan is anti-competitive because it imposes a financial disincentive to continue the practice of law with any firm other than Riker.
Therefore, we affirm the February 22, 2002 summary judgment in favor of Borteck.
NOTES
[1] The remainder of the agreement is sealed.
[2] Borteck calculated that the firm owed him $275,092 payable in ninety-six equal semi-monthly installments. This sum is seventy-five percent of his average annual earnings for the five years prior to his withdrawal.
[3] Jacob v. Norris, McLaughlin & Marcus, supra; Weiss v. Carpenter, Bennett & Morrissey, supra; and Katchen v. Wolff & Samson, supra.