844 A.2d 521

ROBERT D. BORTECK, ESQ., PLAINTIFF–RESPONDENT, v.
RIKER, DANZIG, SCHERER, HYLAND & PERRETTI
LLP, DEFENDANT–APPELLANT.

Argued February 18, 2004—Decided April 5, 2004.

*Glenn A. Clark* argued the cause for appellant (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; *Mr. Clark, Edward A. Zunz, Jr.* and *Eric K. Blumenfeld* on the briefs).

Robert Novack argued the cause for respondent (Edwards & Angell attorneys; *Mr. Novack* and *Mary L. Moore* on the brief).

The opinion of the Court was delivered by

VERNIERO, J.

We are called on to review the retirement provisions of a law firm's partnership agreement. The Appellate Division invalidated the provisions based on its view of *Rule of Professional Conduct (RPC)* 5.6 and existing case law. Given the rule's current language, we disagree and reverse. Further, we direct the Professional Responsibility Rules Committee to consider whether *RPC*

5.6 requires any revision to provide clearer guidance to the bar concerning the elements necessary to establish a bona fide retirement plan under the rule.

## I.

Plaintiff Robert Borteck is an attorney-at-law of New Jersey. From April 1989 to September 2000, he was a capital partner at defendant Riker, Danzig, Scherer, Hyland, & Perretti, LLP. At fifty-three years of age, plaintiff withdrew from defendant and joined another law firm with offices in this State. At the time of his departure, plaintiff was a party to an agreement with defendant that is the center of this dispute. The agreement sets forth a withdrawing or retiring partner's entitlement to certain monies as well as a notice provision governing the departure itself.

Paragraph 17(A) of the agreement provides that a capital partner is entitled to a share of the firm's "net worth" and shall be paid the value of that share over the first twelve months following his or her withdrawal. The parties do not dispute that defendant properly has paid plaintiff $145,649.48, his full share of the firm's net worth under that paragraph.

Paragraph 17(B) contains the eligibility criteria for retirement benefits. It provides, in pertinent part:

> For purposes of Paragraph 17 of this Agreement, the term "retirement" shall mean permanent retirement of a Capital Partner of the Firm from the private practice of law, whether or not due to disability, subject to the following qualifications:
>
> (1) Except in the case of the situations identified in Paragraph 17(B)(3) below, or in the case of a Capital Partner who becomes disabled, the Capital Partner is at least fifty-five (55) years of age.
>
> (2) Continuation with the Firm in an Of Counsel capacity after retirement as a Capital Partner of the Firm shall not be deemed to be inconsistent with eligibility for retirement benefits hereunder.
>
> (3) It has been common for partners of the Firm to join the Firm after completion of a period of public service, to leave the Firm permanently or temporarily to pursue public service, or to devote substantial time to public service activities while remaining a partner with the Firm. The Firm recognizes a professional obligation to serve the public and wishes to continue to encourage such participation by partners of the Firm. Therefore, a partner shall be deemed to have retired from

the private practice of law notwithstanding that he or she leaves the Firm to accept an appointment to the bench, to assume an elected or appointed governmental position, to assume a position in academia, to become a public advocate, to become a public defender, to become a legal services attorney, or to engage in comparable public service work at a compensation level comparable to that normally associated with the foregoing enumerated activities.

. . . .

Any retired Capital Partner's entitlement to continuation of any retirement benefits provided for in this Agreement during his or her lifetime shall be conditioned at all times upon his or her continuously remaining in a retirement status, as defined in this Paragraph 17(B), throughout the entire applicable retirement benefit payment period, including continuous compliance with the foregoing criteria. In the event that such retirement status shall cease during his or her lifetime, then entitlement shall permanently terminate with respect to all unpaid retirement benefit payments.

Paragraph 17(C) of the agreement concerns benefits for early retirement and provides, in relevant part:

In addition to payment for Net Worth, as set forth in Paragraph 17(A) of this Agreement, a retiring Capital Partner who has been a partner of the Firm, or predecessor firms, for a period of at least ten (10) consecutive years, and who, throughout the subsequent five year Early Retirement Benefit Payment period following such Retirement from the Firm, continuously remains in retirement status hereunder, shall receive Early Retirement Benefit Payments equal to a percentage ("Applicable Early Retirement Percentage") of such partner's average annual earnings from the Firm or predecessor firms for his or her last five full calendar years immediately preceding retirement as a Capital Partner of the Firm[.]

. . . .

If a Capital Partner should die prior to receipt of all Early Retirement Benefit Payments to which he or she was entitled hereunder, his or her estate shall be eligible to receive the remaining monthly payments thereof to which such partner otherwise would have been entitled.

The paragraph also sets forth a "schedule" for determining the Applicable Early Retirement Percentage, which ranges from zero to one-hundred-fifty percent, depending on the retiree's years as a partner with the firm or predecessor firms. Under that schedule, assuming all conditions are satisfied, a withdrawing partner with plaintiff's years of service would be entitled to seventy-five percent of his or her average annual earnings in the five calendar years

preceding retirement. Such payments would "be paid in 96 equal semi-monthly installments, the first installment being due thirteen months after retirement from the Firm." As the Appellate Division explained:

Thus, payments under [defendant's] early retirement plan, as set out in Paragraph 17(C), commence in the month following completion of the one-year net worth payout made to withdrawing partners under Paragraph 17(A) and continue for four years thereafter. A withdrawing capital partner eligible under [defendant's] early retirement plan would therefore receive payments from [defendant] over a five-year period: one year of net worth payments, followed by four years of early retirement benefits.

[*Borteck v. Riker, Danzig, Scherer, Hyland & Perretti*, 362 *N.J.Super.* 284, 288, 827 *A.*2d 1121 (2003).]

Pursuant to the above provisions, plaintiff contends that he is entitled to a total of $275,090, in addition to the amount already received as payment of his share of defendant's net worth.

The agreement's other disputed provision is Paragraph 14, which sets forth the procedures concerning a partner's withdrawal or retirement. It provides, in part:

Should any partner desire to retire or withdraw from the Firm, he or she shall give not less than three months' prior written notice of such intention to retire or withdraw to the other partners, provided, however, the Management Committee, in its judgment, may make the retirement or withdrawal effective at such earlier date as it may determine if circumstances so warrant.

Plaintiff withdrew from defendant with little or no formal notice to the firm (plaintiff himself describes his withdrawal as a "prompt departure") and, according to the Appellate Division, "began soliciting many of his former clients[.]" *Borteck, supra,* 362 *N.J.Super.* at 290, 827 *A.*2d 1121. After defendant refused to pay the requested retirement benefits on the ground that plaintiff had not "retired" as defined in the agreement, this litigation ensued. Specifically, plaintiff filed a complaint claiming defendant had failed to pay him the $275,090 allegedly due under the agreement's Paragraph 17(C). Defendant answered, asserting counterclaims and damages for, among other things, alleged breach of fiduciary duties to the firm, and for alleged tortious interference with prospective economic advantage. Plaintiff denies those allegations, which are not the subject of this appeal.

Plaintiff moved for summary judgment. The trial court granted that motion, ordering specific performance of the early retirement provisions and awarding plaintiff his requested amount. It reserved for trial certain aspects of defendant's counterclaims. The court subsequently declared its summary judgment order to be a final judgment, permitting defendant to appeal to the Appellate Division as of right without leave of court. *R.* 4:42–2(1). In a reported opinion, the Appellate Division affirmed the trial court's disposition in favor of plaintiff. *Borteck, supra,* 362 *N.J.Super.* at 286, 827 *A.*2d 1121. The panel concluded that, if the retirement benefits are not paid to plaintiff in the amount asserted, then the firm's agreement would "have anti-competitive effects prohibited by *RPC* 5.6." *Id.* at 294, 827 *A.*2d 1121. We granted defendant's petition for certification. 178 *N.J.* 33, 834 *A.*2d 406 (2003).

## II.

■ This Court's constitutional authority to regulate the legal profession extends to the adoption of the *Rules of Professional Conduct. Jacob v. Norris, McLaughlin & Marcus,* 128 *N.J.* 10, 17, 607 *A.*2d 142 (1992) (citing *N.J. Const.* art. VI, § 2, ¶ 3). We previously have observed that the *RPCs* "establish the state's public policies with respect to attorney conduct. Contracts that violate the [*RPCs*] violate public policy, and courts must deem them unenforceable." *Ibid.* One of the goals inherent in those policies is to foster competition among attorneys and thereby afford the public wide access to legal services. *Id.* at 17–22, 607 *A.*2d 142.

Within that context, *RPC* 5.6 states, in pertinent part, that a "lawyer shall not participate in offering or making . . . a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement[.]" We enacted the rule as a result of recommendations made by a Court-appointed committee chaired by Judge Dickinson R. Debevoise of the United States District Court. See *Jacob, supra,* 128 *N.J.* at

17–19, 607 *A*.2d 142 (outlining history of rule); Michels, *New Jersey Attorney Ethics* § 9:2 at 138 (2004) (same). The rule is based on a model rule of the American Bar Association and has remained unchanged since we adopted it in 1984. Michels, *supra,* § 9:2 at 138.

Neither the report of the Debevoise Committee nor the text of the rule contains a definition of "retirement." Despite that lack of specificity, the rule's plain language treats a retirement agreement as an exception to the prohibition against restricting an attorney's right to practice after that attorney terminates a relationship with his or her firm. See *First Resolution Inv. Corp. v. Seker,* 171 *N.J.* 502, 511, 795 *A*.2d 868 (2002) (applying canons of statutory construction in interpreting court rules, including principle that enactments are to be construed consistent with their plain meaning). From that perspective, the retirement exception acts as a safe harbor, permitting restrictions on the practice of law not otherwise tolerated under the rule. This case requires us to determine whether defendant's retirement requirements fall sensibly within that safe-harbor provision or whether they are so unreasonable that they must be deemed void as against public policy.

For guidance in making that determination, we turn first to the seminal case addressing *RPC* 5.6, *Jacob, supra,* 128 *N.J.* 10, 607 *A*.2d 142. In *Jacob,* the challenged provisions did not focus on retirements as do the provisions in this case, but rather drew "a sharp distinction between competitive and non-competitive departures " 128 *N.J.* at 15, 607 *A*.2d 142. A competitive departure involved circumstances "in which the [withdrawing] member solicits firm clients or employees to leave the firm with him or her[.]" *Ibid.* The agreement awarded compensation to attorneys who departed under the non-competitive provision. *Ibid.* Regarding competitive departures, however, the agreement provided that " 'the Law Firm shall have no obligation to pay and the [withdrawing] Member shall have no right to receive any termination compensation.' " *Ibid.*

We concluded that, although the agreement was not a direct restraint, because it selectively withheld compensation and essentially penalized a withdrawing lawyer who opted for a competitive departure, it "violate[d] both the language and spirit of *RPC* 5.6." *Id.* at 22, 607 *A*.2d 142. We also noted that, as one example of the agreement's infirmity, its financial disincentives bore "no direct relationship to the financial damage that the firm may or may not incur [as a result of a competitive departure]." *Id.* at 28, 607 *A*.2d 142. Writing for a unanimous Court, Justice Garibaldi explained: "[I]f the departing partner merely completed one matter for one former client, the entire compensation package would be forfeited despite the limited financial impact on the firm. In fact, the provision operate[d] as a penalty designed to protect the former law firm's turf." *Ibid.*

Other than the Appellate Division's opinion in this case, we are aware of only one reported New Jersey decision that focuses specifically on a firm's retirement plan. In *Apfel v. Budd, Larner, Gross, Rosenbaum, Greenberg & Sade,* a firm's shareholder-member agreement defined retirement as occurring when

"the Shareholder ceases the practice of law within all states in which the [C]orporation [the former law firm] maintains an office, determined as the date of retirement. Notwithstanding the foregoing, appointment as a member of the judiciary or engagement as a full-time employee attorney by organization or individual other than by a law firm, shall be deemed retirement. If a shareholder returns to the practice of law within two (2) years of the date of his or her retirement, such Shareholder shall return to the Corporation all payments received on account of deferred income and all future payments of deferred income shall cease even if the Shareholder may subsequently retire[.]"

[324 *N.J.Super.* 133, 135–36, 734 *A*.2d 808 (App.Div.), *certif. denied,* 162 *N.J.* 485, 744 *A*.2d 1208 (1999).]

The agreement also provided that an attorney "who does 'retire,' and who has been a shareholder for at least ten years, receives substantial payments of so-called 'deferred income.'" *Id.* at 135. Accordingly, under a stated formula, the benefits awarded to the plaintiff attorney who withdrew but did not "retire" from the firm were significantly less than the benefits that would have been paid had he satisfied the retirement definition. *Ibid.*

Relying in part on *Jacob,* the *Apfel* court invalidated the challenged provisions, stating that

the benefits to be paid or withheld under this agreement do not turn on any bona fide retirement. The size of the benefits depend not on age or years of service (beyond a minimum of ten years with the firm) but rather turn on competition or non-competition with [the former firm]. Thus, a withdrawing attorney could move to any state other than New Jersey, New York or Pennsylvania, join or form a firm and make a good deal of money, and he or she would be entitled to the larger, non-competitive benefits payable under the Agreement. On the other hand, if that attorney decided to open a one-person law firm and practice in any one of the three proscribed states, he or she would only receive the smaller package of benefits. And the sole difference would be whether or not the person practiced in the same state as—and thus was able to compete with—[the former law firm]. Under no realistic analysis could this Agreement be deemed one providing retirement benefits. It is clearly a restrictive covenant, with substantial financial disincentives, cloaked as a retirement agreement.

[*Id.* at 142–43, 734 *A.*2d 808.]

Although *Jacob* and *Apfel* are helpful in supplying a conceptual framework, because their facts differ from the facts in this case, those cases do not control the analysis. In *Jacob,* we neither confronted retirement provisions like the provisions now before us nor addressed the safe-harbor language of *RPC* 5.6. Thus, the Court's intolerance for the indirect restraints at issue in *Jacob* cannot easily be imported to the present dispute. Similarly, unlike the agreement here, the retirement agreement in *Apfel* contained no minimum age requirement and defined retirement as occurring when the withdrawing partner ceased practicing only in the three states in which the former firm had maintained its offices.

▆ Distinguishing the agreement in *Apfel* from defendant's agreement does not lead us automatically to conclude that defendant's agreement passes muster. We still must evaluate the agreement to determine whether it contains sufficient indicia of a bona fide retirement arrangement to fit reasonably within the rule's exception. In so doing, we hold that the agreement sufficiently operates as a retirement plan within the contemplation of *RPC* 5.6 and that as such, it does not offend the public policies underlying the rule. Hence, the agreement's eligibility require-

ments, including the age threshold and conditions concerning the private practice of law, are enforceable against plaintiff.

In reaching that conclusion, we are persuaded in part by the uncontested certification submitted by Howard M. Phillips, defendant's proffered actuary and employee benefits consultant. A member of the American Academy of Actuaries and of similar professional associations, Phillips expresses the view that, although it might not technically qualify as a retirement plan under rules of the Internal Revenue Service, defendant's agreement "includes all of the normal indicia one would expect to see in a legitimate retirement plan." He cites as examples the agreement's minimum age requirements, the fact that the agreement contains benefit calculation formulas and a defined term for benefit payouts, and the fact that benefits increase as years of service to the firm increase and are payable to a deceased retiree's estate.

We also are persuaded by the fact that defendant's agreement resembles in one or more respects agreements that have been upheld by courts in other jurisdictions operating under rules containing safe-harbor language similar in wording to *RPC* 5.6. In *Donnelly v. Brown, Winick, Graves, Gross, Baskerville, Schoenebaum & Walker*, the Supreme Court of Iowa upheld a law firm's retirement agreement that required for eligibility "ten years of service and sixty years of age or twenty-five years of service[.]" 599 *N.W.*2d 677, 682 (1999). The court so acted notwithstanding that the agreement conditioned the receipt of benefits on the attorney's "remaining out of the private practice of law in Iowa." *Ibid.* The court stated: "[T]here is no doubt that the Rule is designed to permit attorneys to have retirement plans that have noncompetition conditions—there is simply no other explanation for the exception to the Rule." *Id.* at 681 (internal quotation marks and citation omitted) (alteration in original).

In a separate opinion, a concurring justice discussed three criteria espoused by a noted commentator, Robert W. Hillman, that are useful for defining a retirement plan in this setting. *Id.* at 683–84 (Ternus, J., concurring) (citing Robert W. Hillman,

*Hillman on Lawyer Mobility* § 2.3.5 at 2:90–91 (2d ed. Supp. 1999)). According to Hillman, the first and most important factor "is the existence of minimum age and service requirements." *Id.* at 683 (Ternus, J., concurring) (internal quotation marks and citation omitted). As already indicated, defendant's plan satisfies the age criterion, requiring retiring partners to be at least age fifty-five (except when entering public service, as more fully addressed below).

As for the service requirement, the agreement provides early retirement benefits when "a retiring Capital Partner [ ] has been a partner of the Firm, or predecessor firms, for a period of at least ten (10) consecutive years[.]" Also as indicated below, in respect of supplemental benefits, the agreement requires a retiree to be between sixty to sixty-five years of age and to have been with the firm or a predecessor firm for at least twenty years. Those provisions distinguish this case from *Apfel* and help us to conclude that defendant's plan is legitimate for purposes of the rule.

"A second factor to consider is the existence of provisions dealing independently with withdrawal for purposes of retirement and withdrawal for other reasons." *Donnelly, supra,* 599 *N.W.*2d at 683–84 (Ternus, J., concurring) (internal quotation marks and citation omitted). Although defendant's agreement addresses retirement and non-retirement withdrawals under the umbrella heading of Paragraph 17, the paragraph contains detailed subsections that separately govern the two forms of departure. For instance, subsection (A) makes clear that a non-retiring partner is entitled to his or her share of net worth to be payable within one year of withdrawal. In contrast, subsections (C) and (D) set forth a multi-year schedule for payments of early or supplemental retirement benefits. Those distinctions, among others, appear consistent with the separate and distinct treatment envisioned by the second Hillman factor.

Hillman's third factor focuses on the time period over which the benefits are to be paid, the implication being that "the payment of benefits over an extended period supports the conclusion that the

payments are in fact for the purpose of funding a retirement." *Id.* at 684 (Ternus, J., concurring) (internal quotation marks and citation omitted). That factor, of course, turns on our sense of what is an "extended period." Under defendant's early retirement provision, the payout period extends five years from the date of departure (during which there is one year of net-worth payments and four years of retirement benefits).

Under a separate provision, partners who are between sixty and sixty-five years of age, and who satisfy a twenty-year service condition, can qualify for "Supplementary Retirement Benefits." According to Paragraph 17(D), those benefits are paid "over a period of ten years immediately following retirement[.]" In short, given that *RPC* 5.6 is silent on any of the foregoing factors, we are persuaded that a five- or ten-year payout, depending on whether the partner has qualified for early or supplemental benefits, constitutes a sufficiently extended period in satisfaction of the third criterion relevant to our analysis.

Additionally, defendant contends, and plaintiff does not dispute, that by dovetailing the agreement with other retirement plans established under Internal Revenue Service rules, a qualifying partner can receive payments over periods longer than five or ten years. Defendant explains in its brief that it

designed the various benefits to support the retiree as he ages. For example, if a partner decided that he wanted to retire "early" at age 55, he could do so (provided that he met the length-of-service requirement). His Early Retirement Benefit payments would start at age 56, following return of his capital, and end at age 60. By age 60, the retired partner could withdraw the principal and/or income of his 401 plans without penalty. At age 65, he would be eligible for social security. Each of these instruments support[s] the retiree like the rungs of a ladder. [Defendant's] plan thereby provides an extended disbursement period, certainly *more than 10 years, even for a partner who retires at age 55.*

[ (Internal citations omitted) (emphasis added).]

Defendant's agreement contains no explicit expression of the drafter's intent in respect of those purported dovetailing effects. For example, we find no recital or descriptive language indicating that the parties intended to sustain a disbursement period of "more than 10 years, even for a partner who retires at age 55."

However, to the extent that the agreement's drafter construes it to operate in that fashion (without apparent contradiction by plaintiff), that only enhances our belief that it promotes an extended benefits payout consistent with a bona fide plan. The critical point is that unless or until we add greater specificity to *RPC* 5.6, it behooves law firms to embrace in good faith the extended-payout and other criteria discussed above to assure enforceability of their agreements in the future.

Another relevant consideration is that, as we understand defendant's description of the plan, the benefits established under it are funded at least in part from revenues "that post-date the withdrawal of the partner," *Hoff v. Mayer, Brown & Platt*, 331 *Ill.App.*3d 732, 265 *Ill.Dec.* 225, 772 *N.E.*2d 263, 268 (2002), *appeal denied*, 201 *Ill.*2d 567, 271 *Ill.Dec.* 925, 786 *N.E.*2d 183 (2002). From that perspective, requiring eligible retirees to refrain from private practice rather than compete with defendant for business, or to remain of counsel with the firm, appears reasonable to the Court. Upholding the sound public policies underlying *RPC* 5.6 does not mean that firms must accept utterly irrational or unfair results. Even *Jacob, supra*, for all its forceful language against restrictions in a non-retirement context, recognized that "accounting for the effect of the partner's departure on the firm's value [when determining what might be owed to that partner] is not unreasonable." 128 *N.J.* at 28, 607 *A.*2d 142.

In sum, the circumstances surrounding the agreement before us differ in material respects from the arbitrary or punitive conditions that were present in *Jacob* and in the other reported decisions cited by plaintiff. *See, e.g., ibid.* (invalidating firm agreement described by Court as protectionist "penalty"); *Weiss v. Carpenter, Bennett & Morrissey*, 143 *N.J.* 420, 444–45, 672 *A.*2d 1132 (1996) (explaining unenforceability of agreement that required withdrawing partners to forfeit their capital accounts); *Katchen v. Wolff & Samson*, 258 *N.J.Super.* 474, 475–76, 610 *A.*2d 415 (App.Div.) (voiding agreement that required withdrawing shareholder-attorney to forfeit equitable interest in firm), *certif.*

*denied,* 130 *N.J.* 599, 617 *A.*2d 1222 (1992). In the same vein, it bears repeating that none of those decisions focused explicitly on *RPC* 5.6's safe-harbor provision, lessening their applicability here.

Our conclusion is not altered by the fact that the agreement contains exceptions for attorneys who withdraw from the firm to assume a governmental position or a position in academia. Because we enacted the *RPCs* with the public interest as a paramount consideration, we see no benefit in invaliding an agreement that encourages or invites attorneys to serve the public in the manner envisioned by defendant's plan. See 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 50.2 at 50–4 to –7 (3d ed. Supp.2004) (discussing public-service obligation of attorneys).

We likewise disagree with the Appellate Division's suggestion that the agreement loses its status as a legitimate retirement arrangement because its age requirement is eliminated when a retiring attorney enters a public or academic office. See *Borteck, supra,* 362 *N.J.Super.* at 294–95, 827 *A.*2d 1121. That aspect of the agreement is consistent with its expressed goal of encouraging public service by members of the legal profession and does not, standing alone, render the agreement unenforceable. See *Neuman v. Akman,* 715 *A.2d* 127 (D.C.1998) (upholding firm's retirement provision that included within retirement definition withdrawing attorney's assumption of governmental or academic office).

### III.

Our holding is influenced in large measure by our view that defendant's agreement facially is consistent with the safe-harbor provision of *RPC* 5.6. Absent greater specificity in the rule itself, it would be unfair to hold defendant to requirements or standards not embodied in the rule's present text. In a different context, we have expressed nearly the same sentiment concerning the standards first announced in *Jacob.* See *Weiss, supra,* 143 *N.J.* at 445, 672 *A.*2d 1132 (stating "concern that retroactive application of

our decision in *Jacob, supra,* not result in extreme unfairness to law firms that prepared their agreements before *Jacob* was decided"). That said, we acknowledge that our decision rests at least in part on the certification of one proffered expert that defendant's retirement plan is legitimate. We believe that the system would be best served in the future if more than one outside opinion were presented and considered on this subject.

Accordingly, we direct our Professional Responsibility Rules Committee to review the safe-harbor language of *RPC* 5.6 to determine whether the rule should define "retirement" and, if so, to propose such a definition or related criteria. Until the Committee returns with its recommendations and until we enact revisions to *RPC* 5.6, if any, we trust that firms will avoid arbitrary, punitive, or unreasonable measures when drafting their retirement agreements. In so doing, firms should be guided by existing case law as supplemented by this opinion.

The remaining issue pertains to the agreement's notice provision found in Paragraph 14, which, according to plaintiff, operates as an improper restraint. There is no dispute that plaintiff left his former firm after providing it little or no formal notice. As a practical matter, then, the agreement's notice-departure language did not operate as an encumbrance in this case. Nor did it prevent plaintiff from receiving his full share of defendant's net worth. Under those circumstances, the notice question essentially is moot. On the facts before us, we do not believe that the arguments related to Paragraph 14 should bar enforcement of an otherwise valid retirement agreement.

Beyond this one appeal, however, we are persuaded that the issue is worthy of review. Therefore, as it considers whether greater specificity is required to define "retirement," the Committee should consider whether we need an express rule or more explicit guidance in respect of an agreement's notice-departure provisions. In our view, such provisions are not unenforceable *per se.* However, until we hear from the Committee on that subject, firms must guard against provisions that unreasonably delay an

attorney's orderly transition from one firm to another, or from the firm to retirement status. See Robert W. Hillman, *Loyalty in Firm: A Statement of General Principles on the Duties of Partners Withdrawing From Law Firms*, 55 *Wash. & Lee L.Rev.* 997, 1004–05 (1998) (discussing factors in evaluating reasonableness of departure-notice provisions).

Lastly, we note for completeness that our discussion of Paragraph 14 is from the perspective of whether it should bar enforcement of defendant's retirement plan. For the reasons just expressed, we have concluded that it should not. Arguably, the notice provision might retain some relevance in respect of defendant's counterclaims, about which we express no opinion. More specifically, in describing factually what plaintiff himself has described as his "prompt departure" from the firm, we intend no view concerning whether that fact satisfies any of the elements of defendant's counterclaims. Those claims and any defenses to them, other than the issues that have been addressed in this opinion, are for the trial court to resolve.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for resolution of defendant's counterclaims and any related issue not addressed in this opinion. We do not retain jurisdiction.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, VERNIERO, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.